UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Docket No. 1:23-cr-10005-DJC |
| | ) | |
| | ) | |
| XIAOLEI WU | ) | |

**DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE
AND INCORPORATED MEMORANDUM OF LAW**

Mr. Xiaolei Wu, defendant in the above-captioned matter, respectfully moves

this Honorable Court to suppress all statements made when he appeared in

Brighton District Court on November 18, 2022, and when he was interrogated by

FBI agents on December 14, 2022, as well as any evidence obtained from the use of

his statements, including the contents of his personal cellphone, as they were

obtained in violation of his rights under the Fifth and Sixth Amendments to the

United States Constitution and *Miranda v. Arizona*, 384 U.S. 436 (1966). Mr. Wu

requests an evidentiary hearing on this motion. As grounds, Mr. Wu submits this

memorandum of law.

**FACTS**

*Background*

Mr. Wu is charged with one count of cyberstalking, in violation of 18 U.S.C. §

2261A, and one count of interstate transmission of a threatening communication, in

violation of 18 U.S.C. § 875, related to events that allegedly occurred in and around

the Berklee College of Music campus between October 22, 2022 and October 24,

1

2022. *See Indictment*, ECF no. 14. On November 18, 2022, Mr. Wu appeared in Brighton District Court after the complaining witness in this case obtained, *ex parte*, a temporary restraining order against him.[1] *See Hearing Transcript*, attached as Exhibit 1.

Mr. Wu was arrested by the (FBI) on December 14, 2022. Without being provided with a Mandarin interpreter, Mr. Wu was then interrogated Special Agents Kirk and Allen. *See FBI Interview Report*, attached as Exhibit 2; *Wu Affidavit*, attached as Exhibit 3; *FBI Interview Transcript*, attached as exhibit 4. During the interrogation, Mr. Wu made several statements and provided the agents with the password to his cellphone, an iPhone 13, which the FBI used to view the phone's contents, both during the interrogation and later pursuant to a search warrant obtained based on information the FBI learned during the interrogation. *See FBI Interview Report*, attached as Exhibit 2, at 8; *Search Warrant Application and Affidavit*, attached as Exhibit 5, at 5.

*Mr. Wu's linguistic and cultural background*

Mr. Wu was born in and grew up in Beijing, China, and his primary language is Mandarin. *See Wu Affidavit*, attached as Exhibit 3. He resided in China for his entire life until August 8, 2021, when he came to the United to begin attending

---

[1] Although it appears from the transcript that the complainant may have initially obtained a restraining order at an *ex parte* hearing, at the ten-day hearing, the judge rejected the complainant's application and refused to extend it. *See Hearing Transcript*, attached as Exhibit 1, at 15-16. As a general matter, a complainant may typically obtain an initial temporary restraining order, lasting no longer than ten business days, via an *ex parte* proceeding. M.G.L. c. 209A, § 4; *Singh v. Capuano*, 468 Mass. 328, 331 (2014). Following the issuance of the initial order, the defendant is provided with notice and an opportunity to be heard at what is colloquially called a "ten-day hearing," which typically must be held within ten court business days of the issuance of the initial *ex parte* order. M.G.L. c. 209A, § 4; *Sing*, 468 Mass. at 331.

Berklee College of Music.[2] *Id.* When he arrived, he spoke very little English. *Id.* Although Mr. Wu's classes have been conducted in English, outside of the classroom environment Mr. Wu has socialized and spent much of his time with other individuals who speak Mandarin. *Id.*

On November 18, 2022, Mr. Wu interacted with the United States legal system for the first time in his life, when he appeared, *pro se*, in Brighton District Court after the complainant in this case obtained, *ex parte*, a restraining order against him. *See Wu Affidavit*, attached as Exhibit 3; *Hearing Transcript*, attached as Exhibit 1, at 1. He was then arrested in this case on December 14, 2022. *See Wu Affidavit,* attached as Exhibit 3; *FBI Interview Transcript,* attached as Exhibit 4, at 2. At that time, as he had had no experience with the United States criminal legal system, he knew very little about it. *See Wu Affidavit*, attached as Exhibit 3. He was unfamiliar with the scope of his *Miranda* rights. *Id.*

On October 25, 2023, Mr. Wu's English proficiency was evaluated by Dr. Charles B. Chang. *See Chang Report*, attached as Exhibit 7, at 1. Dr. Chang completed a joint bachelor's and master's degree in Linguistics at Harvard University, a master's degree in English and Applied Linguistics at the University of Cambridge (UK), and master's and doctoral degrees in Linguistics at the University of California, Berkeley. *Id.* Dr. Chang's research foci are in language sound systems, language learning, and multilingualism. *Id.* As noted, Mr. Wu arrived in the United States in August 2021, and had thus been in the country for a

---

[2] Mr. Wu previously had visited the United States, but had not previously lived in the United States or spent significant time here. *See Wu Affidavit*, attached as Exhibit 3.

little more than a year at the time this case began. This evaluation took place eleven months following Mr. Wu's appearance in Massachusetts District Court and ten months following his interrogation by the FBI and, as such, may reflect a higher proficiency level than Mr. Wu possessed in November or December 2022. *Id.*, at 5.

The evaluation followed the Oral Proficiency Interview (OPI) procedure of the American Council on the Teaching of Foreign Languages. *Id.*, at 1. The OPI procedure includes four parts: an introduction, warm-up, interview, and cool-down. *Id.*, at 1-2. The procedure typically takes twenty to thirty minutes. *Id.*, at 2. The evaluation of Mr. Wu, specifically, "lasted approximately 25 minutes and proceeded through all four parts [of the OPI procedure] listed above." *Id.* A test taker's English proficiency is rated on a four-level scale, ranging from Novice (level 1) to Superior (level 4). *Id.*, at 2-3.

Through administering the OPI procedure to Mr. Wu, Dr. Chang observed that "there are significant limitations in his English ability." *Id.*, at 3. As a result, Dr. Chang rated Mr. Wu as intermediate, or level 2. *Id.* Critically, Mr. Wu "does not necessarily recognize or act when he has failed to understand something, and he may let the conversation proceed in the hopes that he will pick up things he missed later on in the conversation." *Id.* At several points in the evaluation, it became clear to Dr. Chang that Mr. Wu had not understood an earlier question or prompt. *Id.*

Dr. Chang also reviewed the transcript of the Brighton District Court hearing and the audio recording of the FBI interview. *Id.*, at 3-4. The hearing and FBI

interview will both be discussed in more detail below, but it should be noted that, on review, Dr. Chang observed several instances of misunderstandings. *Id.*

From his personal evaluation of Mr. Wu, and review of the hearing transcript and FBI interview audio, Dr. Chang has opined that "there is a reasonably high chance that [Mr. Wu] did not fully understand that Miranda warning that was delivered to him in spoken English during the FBI interview." *Id.*, at 5. Dr. Chang also concluded that, particularly where the "additional probing" he did to discover points of misunderstanding may not have taken place in other contexts, Mr. Wu's "proceeding in a conversation with the appearance of understanding (i.e., lack of signaling misunderstanding) cannot be interpreted with confidence as an indication of understanding." *Id.*

In additional to linguistic barriers, cultural barriers are also relevant to Mr. Wu's lack of understanding of his rights. In China, where Mr. Wu grew up and has spent most of his life, Mr. Wu did not have the right to refuse to answer questions from or otherwise refuse to comply with requests from government agents, nor did he have the right to an attorney. *See Belkin Report*,[3] attached as Exhibit 6, at 1-2. "[T]he Chinese criminal justice system heavily relies upon the confessions of

---

[3] Professor Belkin holds a J.D. Degree from New York University School of Law, an M.A. in Asian Studies from Seton Hall University, and a B.A. in Chinese Studies from SUNY Albany. *See Belkin Report*, attached as Exhibit 6, at 3. He has served as Resident Legal Advisor at the U.S. Embassy in Beijing, been a research scholar at the Yale China Law Center, and worked as Director of the Trade Facilitation Office of the U.S. Embassy in Beijing. *Id.* He then worked for five years as the Program Officer for Law and Rights in Beijing for the Ford Foundation before returning to the United States as Executive Director of the U.S.-Asia Law Institute at New York University School of Law and as an adjunct professor of law. *Id.* Professor Belkin has taught courses on Chinese law, Chinese criminal justice, and comparative criminal justice. *Id.* Professor Belkin has also published scholarship on the Chinese criminal justice system. *Id.* at 6-7.

suspects and defendants to prove criminal offenses[,]" such that "[t]here is a general expectation that all individuals suspected of a crime in China will answer police questions and there is also an expectation that the police will obtain a confession in all cases." *Id.*, at 2, 4. Additionally, although it may, "in theory," be "possible" for a defendant to assert a right to silence in court, Dr. Belkin is "not aware of a defendant" asserting such a right." *Id.*, at 2. It is Dr. Belkin's "understanding that there is no explicit right to remain silent or to have counsel present during any official questioning of individuals in China." *Id.*, at 5.

The National People's Congress codified an exclusionary rule for coerced confessions in 2012 and required that police interrogations be recorded "in serious cases," but "Chinese government has declined to adopt a right to silence or a right to counsel to prevent coerced confessions." *Id.*, at 2. Thus, recent reform efforts "have not enhanced the rights of individual suspects to remain silent in the face of interrogation or to obtain the advice of counsel during interrogation." *Id.*, at 4. Finally, "[c]riminal cases in China are commonly depicted in Chinese media in news accounts and in fiction," *Id.*, at 2, such that there is some level of transparency with the public surrounding these procedures and their attendant lack of protections.

*State court hearing on November 18, 2022*

As stated, on November 18, 2022, Mr. Wu appeared in Brighton District Court for a hearing on a restraining order which had been obtained, *ex parte*, by the complainant in this case. *See Hearing Transcript,* attached as Exhibit 1, at 1. Mr.

Wu did not have an attorney and had never before interacted with the United
States court system, civil or criminal. *See Wu Affidavit*, attached as Exhibit 3.

There were several points throughout the hearing when Mr. Wu did not
understand questions or statements from the court. For example, after Mr. Wu told
the court that the complainant put posters around school, there is an almost
nonsensical exchange. The court asked, "Posters of what?" *See Hearing Transcript*,
attached as Exhibit 1, at 6. Mr. Wu's response was, "The poster." *Id*. The court
clarified, asking "What does the poster say?" *Id*. Mr. Wu's next response indicated a
continuing lack of understanding: "We just talk about the Chinese – like Chinese
political things." *Id*. The court then asked, "Like what?" *Id*. Mr. Wu responded,
"Like the Courts. Like the Court." *Id*. The Court tried again, "Tell me, tell me. What
is this about? What's the --." *Id*. Mr. Wu responded, "Can I see the Court again?" *Id*.
The Court asked, "So, a court?" *Id*. Mr. Wu responded, "It's a court. It's some – kind
of some language right on the poster you can put on the school." *Id*. At that point,
the court appeared to give up on this line of questioning, saying, "All right, so she
posted *something*, and you thought that would get her in trouble if she goes back to
China?" *Id*. (emphasis added).

A few moments later in the hearing, the court asked Mr. Wu, "So, what do
you care? What do you care if she [the complainant] does that [posts posters] or
not?" *Id.*, at 7. Mr. Wu did not initially understand, responding, "What?" *Id*.

At a later point in the hearing, the complainant admitted that she told Mr.
Wu she was going to put his name on her political posters, which Mr. Wu believed

would result in his arrest and his family's arrest in China. *Id.*, at 4, 7-8. The complainant alleged that she said that because Mr. Wu said he wanted to chop her hands off. *Id.*, at 8. When questioned about this by the court, Mr. Wu stated that he "kind of used some aggressive language." *Id.*, at 9. He did not describe the statement as a threat. *Id.* However, the court then instructed Mr. Wu that it was a threat, saying "I'm going to chop your hands off is a little more than aggressive language. Aggressive is I'm going to call your parents. Aggressive, I'm going to call the dean. I'm going to chop your hands off is a threat." *Id.* Mr. Wu acquiesced to the court's authoritative statement, responding "okay." *Id.* However, the court refused to accept Mr. Wu's acquiescence, asking, "What do you mean, okay? Do you get it?" *Id.* Only then did Mr. Wu respond, "I know that was a threat."[4] *Id.*

A few moments later, Mr. Wu at first did not understand when the Court asked, "Where are you at school?" *Id.*, at 10. At another point, Mr. Wu did not understand when the court asked, "How many siblings do you have?" *Id.*, at 13. He only understood after the court clarified that "siblings" meant "brothers and sisters." *Id.*

Several of these misunderstandings were also identified by linguistics expert Dr. Charles B. Chang when he reviewed the hearing transcript. *See Chang Report*, attached as Exhibit 7, at 3-4. Finally, the court's tone was often forceful and scolding. For example, at one point the court instructed Mr. Wu, "Don't you dare,

---

[4] When questioned a month later by FBI agents, Mr. Wu stated, "I went to the Court, I think, from November 18, and the – the Court – the Judge just told me that was a threat. What you said, what you did is a threat. I know that." *See FBI Interview Transcript*, attached as Exhibit 4, at 6.

don't you dare speak to her, write to her, write about her, think about her. Do you understand me?" *Hearing Transcript*, attached as Exhibit 1, at 12.

*FBI Interrogation on December 14, 2022*

FBI agents arrested Mr. Wu the following month, on December 14, 2022. *See Wu Affidavit,* attached as Exhibit 3. They placed him in handcuffs and transported him to FBI headquarters for interrogation prior to his initial appearance in Court. *See id.*; *FBI Interview Transcript,* attached as Exhibit 4, at 25-26. When the interrogation began, and during the reading of his *Miranda* rights, Mr. Wu did not know why he had been arrested. *See FBI Interview Transcript*, attached as Exhibit 4, at 2-5. Following his purported *Miranda* waiver, Mr. Wu said he did not know why he was there. *Id.*, at 5. Special Agent Kirk did not explain to Mr. Wu why he had been arrested and, instead, launched directly into questioning.[5] *Id.*

Additionally, before reading Mr. Wu his *Miranda* rights, Special Agent Kirk explained the interview process to Mr. Wu. *Id.*, at 2. First, he explained that "the way it works in the United States is when you get arrested, we're willing to get your side of the story and see if it conflicts with anything that we got that we used for a reason to arrest you." *Id*. Mr. Wu asked, "I don't have lawyer?" *Id.*, at 3. Special Agent Kirk's response was as follows:

> "So if you can't afford a lawyer, one could be provided for you *down the line.* And all that's going to be explained when you see the Judge. *For this, we are*

---

[5] Special Agent Kirk stated, "So obviously I know you have a million questions of why…" Mr. Wu responded, "Yeah I don't know why I'm here." Instead of telling Mr. Wu why he had been arrested and what charges he was facing, Special Agent Kirk directly launched into the interrogation, asking, "Yep. Well, how about this? Do you recognize this?" and handed a document to Mr. Wu to review. *See FBI Interview Transcript*, attached as Exhibit 4, at 5.

> *just sitting down with you real quick,* seeing if you want to give your side of
> the story regarding why we arrested you. But before I can explain any of that,
> we have to read you this form right here, and then if you want to talk for five
> minutes or an hour, it's up to you, right? Um, you can stop the interview at
> any point. If you don't want to talk, you don't have to talk, right?"

*Id.* (emphases added).

Special Agent Kirk then provided Mr. Wu with a version of the *Miranda* card

in "Chinese – Simplified Characters" and explained that he would be reading the

English version. *Id.*; *FD-395, Advice of Rights Form*, attached as Exhibit 8. His

instructions to Mr. Wu were that, "I'm just going to go down each one of these lines,

and then all I need for you is to say that you understand what was read to you. And

then at the end you can say whether or not you want to talk or you want a lawyer."

*See FBI Interview Transcript*, attached as Exhibit 4, at 3. Special Agent Kirk

proceeded to read the form in English, asking Mr. Wu periodically if he understood.

*Id.*, at 3-5. Mr. Wu's responses included "yeah," "uh-huh," and "okay." *Id.* When

Special Agent Kirk asked him if he would like to answer questions, Mr. Wu

responded, "I'll just sign [inaudible]." *Id.*, at 5. Mr. Wu signed the English waiver

form. *See FD-395, Advice of Rights Form*, attached as Exhibit 8.

Throughout the interview, there were several points where Mr. Wu clearly

did not understand what was being said to or asked of him. First, when he was told

he would be "appearing before a judge this afternoon," he asked, "This afternoon is

the judge? . . . I go for what?" *FBI Interview Transcript*, attached as Exhibit 4, at 2;

*FBI Interview Audio*, attached as Exhibit 9, at timestamp 01:08-01:22.

Special Agent Allen asked Mr. Wu, "What would happen to her [the complainant's] family?" *FBI Interview Transcript*, attached as Exhibit 4, at 10. This question appeared to be asking Mr. Wu to speculate about what would happen to the complainant if he reported her to Chinese public security. Mr. Wu's response indicated he did not understand what he was being asked, as he answered by denying that he did anything to the complainant or her family. Specifically, Mr. Wu stated: "I don't know. I don't ever see them family. I never, like, report her what she did --." *FBI Interview Transcript*, attached as Exhibit 4, at 10.

Later, Special Agent Kirk attempted to question Mr. Wu about how he allegedly knew where the complainant lived. Mr. Wu did not understand several of the questions, which required clarifications at numerous points:

> SA Kirk: [B]ecause you thought that's where she was living when you posted it?
> Wu: Oh, yeah.
> SA Kirk: But it turns out she didn't live there?
> Wu: Right -- right now she did. I think she moved.
> SA Kirk: Did you go and check to see if she lived there?
> Wu: Right now?
> SA Kirk: No. In the past?
> SA Allen: When you posted it.
> Wu: No, never checked.
> SA Kirk: Okay, how did you figure out you had the wrong address then?
> Wu: The wrong address right now?
> SA Kirk: Yeah. When you posted it, how did you later on figure out that she no longer lived there?
> Wu: Oh, I think the [Berklee] Police just went to her apartment. And right now the room – right now the living is – is my another classmate lived there. And when we get – I get to the first floor to get my package, like the Amazon package, she saw me and he said, oh can you just, what's going on? The [inaudible] found my apartment. Like find the Zoey, Zoey is right here. Oh I know – at that time I know what she lived past – in the past.
> SA Kirk: Yeah.

> Wu: Yeah. Because my classmate told me the [Berklee's] – [Berklee] Police is finding Zoey [inaudible]. Yeah.
> SA Kirk: For this whole thing.
> Wu: Yeah, for this whole thing. And she's not live there. Yeah that's it.
> SA Kirk: Okay, so you found out because [Berklee] couldn't find her at what they thought was her current address?
> Wu: Yeah.

*Id.*, at 14-16.

Special Agent Kirk also questioned Mr. Wu about whether he ever asked anybody to access a former a Berklee alumna's student records. After Mr. Wu was initially unable to respond to a question about what he was planning to do with the records, both agents repeated and attempted to clarify the question multiple times. However, Mr. Wu remained unable to understand what was being asked despite these repeated rephrasings. *Id.*, at 16-17.

Later, Special Agent Kirk attempted to ask Mr. Wu about his upcoming exam, asking, "Is it like you're playing a musical piece, or how's that work?" *Id.*, at 25. Mr. Wu did not understand the question, responding with, "No, I do jazz. I play jazz." *Id.*

Mr. Wu also did not understand when Special Agent Kirk attempted to explain that Mr. Wu would receive discovery in the case:

> SA Kirk: And just so you're aware, in the United States, anything that's produced in a case where you're getting charged, you would receive a copy of that. So you know exactly –
> Wu: The charge – the charge for –
> SA Kirk: No, you receive like, here's what the government's basing that allegation on. Here's their evidence. Right? Like, it's an open system. We just don't say, you got to trust us. This guy definitely did it, but we're not going to show you how we know that. Right?
> Wu: Okay.

*Id.*, at 30-31.

Towards the end of the interview, Special Agent Kirk attempted to explain

the process related to Mr. Wu's initial appearance in the case:

> SA Kirk: So we're going to do, like I said, is you're going to have to get cuffed
> again to get transport[ed]. That's just our policy. We're going to take you to
> the Courthouse, you're going to get logged into the system again, and then
> we're going to find out when the Judge can do your appearance in the
> afternoon. Make sense?
> Wu: Parents?
> SA Kirk: Initial– we call it initial appearance. But you're going to be
> standing in front of a Judge.
> Wu: Okay.
> SA Kirk: The judge will explain everything to you.
> Wu: Okay.
> SA Kirk: Sound good?
> Wu: Uh-huh.

*Id.*, at 44.

*The FBI's obligations to Mr. Wu as a limited English proficient (LEP) individual*

On December 19, 2022, just five days after Mr. Wu's arrest and interrogation

by FBI agents, the Department of Justice announced a new Law Enforcement

Language Access Initiative "to assist law enforcement agencies *in meeting their*

*obligations to provide meaningful language assistance to limited English proficient*

*(LEP) individuals.*" U.S. Dep't of Just., *Justice Department Announces New*

*Language Access Law Enforcement Initiative* (Dec. 19, 2022).[6] Although not directly

applicable to government agencies, in 2002 the Department of Justice issued

guidance to recipients of federal funds regarding language access, noting that

custodial interrogation was a "critical area[] for language assistance," requiring

---

[6] Available at https://www.justice.gov/opa/pr/justice-department-announces-new-language-access-law-enforcement-initiative.

interpreters who are "highly competent to translate legal and other law enforcement concepts, a well as [] extremely accurate in their interpretation." Dep't of Just., Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 Fed. Reg. 41455, 41468 (June 18, 2002). The Department also observed that "[c]ustodial interrogations of unrepresented LEP individuals trigger constitutional rights." *Id*. at 41469.

Executive Order no. 13166, *Improving Access to Services for Persons with Limited English Proficiency (LEP)*, applies to all "federally conducted programs and activities," which includes the FBI.[7] *See* Exec. Order no. 13166, 65 Fed. Reg. 50121 (Aug. 16, 2000). Under this order, Federal agencies are required to "examine the services [they] provide[] and develop and implement a system by which LEP persons can meaningfully access those services consistent with, and without unduly burdening, the fundamental mission of the agency. *Id*. Although counsel has conducted an online search, she was unable to locate a language access plan for the FBI. Thus, counsel is unaware of whether the FBI maintains a language access plan in compliance with Executive Order 13166 and, if so, whether its agents complied with that plan when subjecting Mr. Wu to custodial interrogation.

---

[7] In guidance, the government has specified that "custodial interrogations, arrests and detentions, searches, investigations, etc., performed by federal law enforcement agencies" are "example[s] of federal activities covered by the Executive Order." LEP.gov, *Commonly Asked Questions and Answers Regarding Executive Order 13166*, https://www.lep.gov/faq/faqs-executive-order-13166/commonly-asked-questions-and-answers-regarding-executive-order-13166 (last visited May 30, 2023).

## ARGUMENT

**I.     Mr. Wu's purported waiver of his *Miranda* rights was not knowing, intelligent and voluntary where the explanation of his rights was confusing, and he has limited English proficiency and minimal knowledge of the United States criminal legal system.**

For any statements made by an individual subject to custodial interrogation, as well as any evidence obtained by police which flows from those statements, to be admissible in evidence, the police must apprise the suspect of his *Miranda* rights, and demonstrate that the suspect voluntarily, knowingly, and intelligently waived those rights. *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)). The court "must start with a presumption that the suspect did not waive his rights and the government bears the burden of showing the validity of the waiver by a preponderance of the evidence." *United States v. Carpentino*, 948 F.3d 10, 26 (1st Cir. 2020).

### A. Mr. Wu's statements on December 14, 2022, were made in response to custodial interrogation.

A person is in custody for *Miranda* purposes when a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). An individual is subjected to interrogation when they make statements in response to an officer's "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980).

Here, Mr. Wu was undoubtedly in custody when interrogated by FBI agents on December 14, 2022. He had been arrested and transported to FBI Boston

headquarters in handcuffs. *See Wu Affidavit*, attached as Exhibit 3. *See United States v. Rodriguez*, 931 F. Supp. 907, 921, 924 (D. Mass. 1996) (defendant was in custody following arrest on state charges and while he was about to be placed into cruiser for transport to police station); *United States v. Clark*, no. 3:22-30012-MGM, 2023 WL 4706521, at *3-4 (D. Mass. July 21, 2023) (defendant "was clearly in custody when she interacted with agents" where she had been arrested and placed in handcuffs at her home). He was not free to leave. He was told that, following the interrogation, he would be brought before a judge for his initial appearance, and that he would be handcuffed while transported to the courthouse. *See FBI Interview Transcript*, attached as Exhibit 4, at 2, 44. This constitutes custody for *Miranda* purposes. *See Miranda*, 384 U.S. at 456 (police had arrested defendant and taken him to special interrogation room where they secured defendant's confession).

## B. FBI agents did not obtain a knowing, voluntary, and intelligent waiver of Mr. Wu's *Miranda* rights.

Statements made during custodial interrogation are inadmissible unless the interrogating agents first obtained a knowing, voluntary, and intelligent waiver of the suspect's *Miranda* rights.[8] *Miranda v. Arizona*, 384 U.S. 436, 475 (1966). "The requirement of warnings and waiver of rights is [] fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." *Id*. at 476. Therefore, "[m]erely asking the accused whether he understood his rights does not satisfy the duties of an interrogating officer or make

---

[8] This is so even if the statements themselves are ultimately determined to have been voluntary. *See United States v. Barone*, 968 F.2d 1378, 1383 (1st Cir. 1992) (under *Miranda*, a suspect's confession is inadmissible in the absent of specified procedures, without inquiry into voluntariness).

any statements the accused might then make admissible. *Miranda* requires the interrogating officer to go further and make sure that the accused, knowing his rights, voluntarily relinquishes them." *United States v. Porter*, 764 F.2d 1, 7 (1st Cir. 1985).

The inquiry into whether a suspect has made a voluntary, knowing, and intelligent waiver of his *Miranda* rights "has two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id*. Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."[9] *Id*.

A court may conclude that a suspect has waived his *Miranda* rights only where "the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension." *Moran*, 475 U.S. at 421. Factors that may be relevant to this analysis include (1) "any language difficulties encountered by the defendant during custodial interrogation"; (2) "whether the defendant signed a written waiver"; (3) "whether the defendant was advised of his rights in his native tongue"; (4) "whether the defendant appeared to understand his rights"; (5) "whether a defendant had the assistance of a translator"; (6) "whether the defendant's rights were individually and repeatedly explained to

---

[9] "Whether the interrogating officer *perceived* that the defendant understood is immaterial." *United States v. Rang*, No. 1:15-CR-10037-IT-1, 2017 WL 74278, at *5 (D. Mass. Jan. 6, 2017) (emphasis in original).

him"; and (7) "whether the defendant had prior experience with the criminal justice system." *United States v. Garibay*, 143 F.3d 534, 537-538 (9th Cir. 1998) (citations omitted). Cultural background is also relevant to the analysis. *United State v. Sanchez*, No. 12-20008, 2013 WL 4806992, at 7 (C.D. Ill. Sept. 9, 2013).

Here, Mr. Wu signed the English version of FBI form FD-395, titled "Advice of Rights." *See Exhibit 8*. Additionally, nearly all the factors found in *Garibay* are present here. Where the Government cannot prove by a preponderance of the evidence that Mr. Wu's purported waiver of his *Miranda* rights was knowing and intelligent, such waiver was invalid.

In *Garibay*, the Ninth Circuit concluded that a defendant's *Miranda* waiver was invalid where the defendant's primarily language was Spanish, where the interrogating officer incorrectly assumed the defendant was sufficiently proficient in English to understand and waive his *Miranda* rights without the assistance of an interpreter, and his rights were recited to him only in English. *Garibay*, 143 F.3d at 537. Additionally, in *Garibay*, the court found persuasive that there was no evidence the interrogating officer "individually explained each constitutional right to Garibay or repeated the explanation," and Garibay had no previous experience with the criminal process or familiarity with *Miranda* rights and his option to waive them. *Id*. at 538-539.

As noted above, Mr. Wu grew up in China, speaks Mandarin as his primary language, and has limited English proficiency and a limited understanding of United States culture and customs. *Compare with Garibay*, 143 F.3d at 537-538,

and *United State v. Sanchez*, No. 12-20008, 2013 WL 4806992, at 7 (C.D. Ill. Sept. 9, 2013). He had been in the United States for little more than a year at the time of the interrogation. *Compare with United States v. Luciano*, 329 F.3d 1, 7-8 (1st Cir. 2003) (defendant possessed sufficient English language skills to support conclusion that he validly consented to a search where he "spent twelve of his thirty years – including third through eighth grades – in the United States," where "he indicated that he understood English" in the transcript from his interrogation, and where he "correct[ed] the court interpreter as he translated during the suppression hearing"), *and United States v. Abou-Saada*, 785 F.2d 1, 10-11 (1st Cir. 1986) (defendant understood English and *Miranda* warnings where he had lived in U.S. for 16 years, he described in English medical details of a complicated injury he had suffered, and his interpreter said he would sometimes answer questions in English before they were interpreted)

As in *Garibay*, prior to this interrogation, Mr. Wu had no experience and little familiarity with either the United States criminal legal system, the concept of *Miranda* rights, or his option to waive those rights. *Garibay*, 143 F.3d at 539. *See also United States v. Rang*, No. 1:15-CR-10037-IT-1, 2017 WL 74278, at *5 (D. Mass. Jan. 6, 2017) ("Prior experience and familiarity with the criminal justice system also is an important factor in this analysis."). Also as in *Garibay*, Mr. Wu's rights were recited to him in English, and they were not "individually and repeatedly *explained* to him." *Garibay*, 143 F.3d at 538-539 (emphasis added).

19

The agent's periodic questions as to whether Mr. Wu understood while reciting the English *Miranda* warning sheet were not sufficient to establish his understanding. *See Porter*, 764 F.2d at 7. This is particularly the case considering that, when describing the process surrounding the reading of his *Miranda* rights, Special Agent Kirk stated only that, before speaking with Mr. Wu, he had to "read this form right here" and, "all I need for you [Mr. Wu] is to say that you understand what was read to you." *See FBI Interview Transcript*, attached as Exhibit 4, at 3. Thus, there is no evidence to suggest that when Mr. Wu responded affirmatively to the agent's question, "do you understand?," he was doing anything more than merely complying with a simple instruction from a person in a position of authority. *See Garibay*, 143 F.3d at 538-539 (concluding defendant did not understand *Miranda* rights despite defendant's indication to interrogating officer that he understood his rights).

Moreover, although Mr. Wu was provided with a copy form FD-395 in "Chinese – Simplified Characters" "to hold," he was not provided with an opportunity to take the time to read them to himself, nor did the interrogating agent confirm that Mr. Wu had read the warnings in Chinese. *See FBI Interview Transcript*, attached as Exhibit 4, at 3-5; *FD-395, Advice of Rights Form*, attached as Exhibit 8. No oral explanation of his rights was provided in Mandarin. *See FBI Interview Transcript*, attached as Exhibit 4, at 3-5. The version of the form that Mr. Wu signed was in English. *See FD-395, Advice of Rights Form*, attached as Exhibit 8. Therefore, again as in *Garibay*, Mr. Wu was not advised of his rights in his native

20

language. *Garibay*, 143 F.3d at 538. Further, Mr. Wu did not have the assistance of an interpreter or translator. *See Wu Affidavit*, attached as Exhibit 3; *FBI Interview Transcript*, attached as Exhibit 4, at 1 (listing people present during interrogation). As in *Garibay*, Mr. Wu was not offered the option of conducting the interrogation in Mandarin or with the assistance of a Mandarin interpreter, nor did he decline such an offer. *See Garibay*, 143 F.3d at 537; *Wu Affidavit*, attached as Exhibit 3.

Critical to Mr. Wu's lack of understanding of his *Miranda* rights was that, prior to their reading, the interrogating agent made a statement indicating that Mr. Wu did *not* have the right to counsel during his custodial interrogation. When Mr. Wu asked the interrogating officer, "I don't have lawyer?," the agent responded that if he could not afford a lawyer, "one could be provide for you, um, *down the line*, and that's all going to be explained when you see the judge." *See FBI Interview Transcript*, attached as Exhibit 4, at 3 (emphasis added). The agent went on to say that what they were doing then was "just sitting down with you real quick, seeing if you want to give your side of the story regarding why we arrested you, but before I can explain any of that, we have to read you this form right here." *Id.*

The agent's statement that a lawyer may be provided "down the line," not during the interrogation that had just begun, was patently incorrect and misled Mr. Wu – an individual with no experience with the United States criminal legal system – as to his rights. *See, e.g.*, *Miranda*, 384 U.S. at 469. *Cf. United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir. 1991) (officer's statement that signing waiver form would not hurt defendant contradicted *Miranda* warning that statements can be used

against defendant in court, misleading defendant about consequences of waiver),

*and United States v. Botello-Rosales*, 728 F.3d 865, 867 (9th Cir. 2013) (phrasing of

warning suggested right to counsel was contingent on approval of request or

lawyer's availability rather than government's absolute obligation). "[S]uch an

affirmatively misleading advisory does not satisfy *Miranda*'s strictures," *Botello-

Rosales*, 728 F.3d at 867, and negated the later reading of the right to counsel..*See

Beale*, 921 F.2d at 1435 (citing *United States v. Womack*, 542 F.2d 1047 (9th Cir.

1976)) ("waiver invalid where police action negated their assertion that defendant

had a right to counsel").

Moreover, the version of form FD-395 used by the agents in this case suffered

from the same infirmities found ambiguous in *United States v. Clark*, no. 3:22-

30012-MGM, 2023 WL 4706521 (D. Mass. July 21, 2023). Specifically, "[r]ather than

ask[ing] a suspect to affirm receiving and understanding their *Miranda* rights and

then separately ask[ing] whether the suspect consents to waiving their rights, the

FD-395 combines the two inquiries in one ["Waiver of Rights"] section." *Clark*, 2023

WL 4706521 at *4. That section includes the following two distinct sentences: "I

have read this statement of my rights and I understand what my rights are. At this

time, I am willing to answer questions without a lawyer present." *Clark*, 2023 WL

4706521 at *4; *FD-395, Advice of Rights Form*, attached as Exhibit 8. These two

sentences are followed by a single signature line. *Clark*, 2023 WL 4706521 at *4;

*FD-395, Advice of Rights Form*, attached as Exhibit 8.

Because of "the unnecessarily confusing and flawed design of the FD-395," "there is no obvious and unambiguous way of using the form to indicate that a suspect read or was given *Miranda* warnings, understands them, and is exercising, rather than waiving, their rights." *Clark*, 2023 WL 4706521 at *4. Further, as in *Clark*, there was no evidence that Mr. Wu "was actually looking at the document to observe its format or to read along." *Id*. Nor does Mr. Wu's response to Agent Kirk's question about whether he would like to answer questions resolve this ambiguity. In response to this question, Mr. Wu did not respond in the affirmative. Instead, he stated, "I'll just sign," before proceeding to sign FD-395. *See FBI Interview Transcript*, attached as Exhibit 4, at 5.

Mr. Wu's limited English language capabilities further undermined the validity of his *Miranda* waiver. Following an English language proficiency evaluation nearly a year after the FBI interview, Mr. Wu was rated at level 2 of 4 possible levels of proficiency, with "significant limitations in his English ability." *Chang Report*, attached as Exhibit 7, at 3. As noted above, there were multiple points of misunderstanding during the evaluation, and Dr. Chang observed several more obvious points of misunderstandings in reviewing the audio of the FBI interview. *Chang Report*, attached as Exhibit 7, at 4. Importantly, Dr. Chang observed that Mr. Wu "does not necessarily recognize or act when he has failed to understand something," *Chang Report*, attached as Exhibit 7, at 3, meaning there may have been many more instances of misunderstanding during the FBI interview

that may not be immediately apparent upon review of the audio.[10] Finally, Mr. Wu was raised and lived the vast majority of his life in a country in which he would have neither a right to silence nor a right to counsel during a custodial interrogation by police, and in which a full confession would be expected. *See Belkin Report*, attached as Exhibit 6, at 1-2.

Because of Mr. Wu's limited understanding of English and the United States criminal legal system, the interrogating agent's incorrect explanation of the right to counsel, the lack of an interpreter, and the inherent ambiguity in form FD-395, the Government cannot show by a preponderance of the evidence that Mr. Wu understood his *Miranda* rights or the fact that signing form FD-395 would waive them; nor did he appreciate the consequences of waiver. As a result, any statements made during the interrogation, and any evidence obtained from the use of his statements, including the contents of his personal cellphone, must be suppressed. *See Nix v. Williams*, 467 U.S. 431, 441-442 (1984) (fruits of statements obtained in violation of *Miranda* generally must be suppressed); *United States v. Clark*, no. 3:22-30012-MGM, 2023 WL 4706521 (D. Mass. July 21, 2023) (statements obtained in violation of *Miranda* were involuntary, requiring suppression of statements and evidence obtained through use of passcodes provided by defendant during interrogation).

---

[10] *Actual comprehension*, not the appearance of comprehension, is required for a valid *Miranda* waiver. *See Cooper v. Griffin*, 455 F.2d 1142, 1144, 1146 (5th Cir. 1972) (waiver was not knowing and intelligent where "it [was] doubtful that [the defendants] even comprehended" the *Miranda* warnings, regardless of testimony from the interrogating officers that they "appeared to understand").

24

## II.   Mr. Wu's statements during the interrogation were involuntary where he was not provided with an interpreter and did not understand much of what was being said to and asked of him.

Even where there has been a valid *Miranda* waiver, a defendant's statements made while in custodial interrogation nevertheless must be suppressed where the statements were involuntary. *E.g.*, *United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990). A defendant's statement is involuntary where, considering the totality of the circumstances, his will was "overborne so that the statement was not his free and voluntary act." *Id*. The relevant circumstances "include[e] both the nature of the police activity and the defendant's situation." *United States v. Hughes*, 640 F.3d 428, 438 (1st Cir. 2011). The defendant's situation includes his attributes, such as age, education, intelligence, mental condition, *id*., prior experience with the criminal justice system, *United States v. Jacques*, 744 F.3d 804, 809 (1st Cir. 2014), and level of English proficiency, *United States v. Mahmood*, 415 F. Supp. 2d 13, 19 (D. Mass. 2006). "In short, an inquiring court must conduct the juridical equivalent of an archaeological dig into the whole of the circumstances." *Hughes*, 640 F.3d at 438. A "finding that a confession is not 'voluntary' requires a finding of coercive police activity, even if only in the form of a custodial interrogation." *United States v. Díaz-Rosado*, 857 F.3d 116, 123 (1st Cir. 2017). The government bears the burden of proving voluntariness by a preponderance of the evidence." *Jackson*, 918 F.2d at 241.

As stated, Mr. Wu has limited English proficiency and minimal understanding of United States culture and customs. Prior to this interrogation, he

had been living in the United States for just over a year, having resided in China for his entire life previously. *Compare with Abou-Saada*, 785 F.2d at 10 (defendant had lived in the United States for sixteen years)*, and Luciano*, 329 F.3d at 7-8 (defendant had lived in the United States for twelve years, and had attended school in the U.S. from third through eighth grades). Additionally, prior to this interrogation, Mr. Wu had no experience and little familiarity with the American criminal justice system. *Compare Mahmood*, 415 F. Supp. 2d at 15, 19 (defendant's confession was involuntary where his "grasp of the [English] language was tentative and he often did not understand the questions put to him," and he "had never before encountered state or federal law enforcement officials").

Moreover, the FBI agents never told Mr. Wu why he was arrested and being interrogated, despite Mr. Wu posing the question early in the interrogation. *See FBI Interview Transcript*, attached as Exhibit 4, at 5. The FBI was aware that Mr. Wu was a foreign national and unfamiliar with the American criminal justice system. *Id.*, at 2 (commenting on "the way it works in the United States"). The FBI was aware of Mr. Wu's limited English proficient (LEP) status, as indicated in part by the provision of a written version of *Miranda* warnings in "simplified Chinese." *Id.*, at 3; *FD-395, Advice of Rights Form*, attached as Exhibit 8. The FBI also was aware of Mr. Wu's LEP status (or should have been) due to his repeated failures to understand what was being said to him and the resulting nonresponsive answers or requests for repetition, noted above.[11] *Compare with United States v. Pece*, No. 1:20-

---

[11] As stated above, it is unclear whether the FBI maintains a language access plan in compliance with Executive Order 13166 and, if so, whether its agents complied with that plan when subjecting

CR-186-1, 2021 WL 4894317, at *4 (N.D. Ohio Oct. 20, 2021) (defendant's answers were responsive and defendant never asked to have questions repeated or otherwise indicate he did not understand the questions or the reason he was being interrogated).

For example, several of Mr. Wu's misunderstandings appear plainly on the face of the interrogation transcript:

(1) Mr. Wu did not understand what was being said when an FBI agent told him he would be "appearing before a Judge this afternoon." *See FBI Interview Transcript*, attached as Exhibit 4, at 2.

(2) Mr. Wu did not understand when an FBI agent asked him to speculate about what "would happen to [the complainant's] family" if he reported her to Chinese public security. *Id.*, at 10.

(3) Mr. Wu did not to understand what was being said when an FBI agent asked him about where he thought the alleged victim lived. *Id.*, at 14-16.

(4) Mr. Wu did not to understand what was being said when FBI agents asked him about seeking access to the alleged victim's school records. *Id.*, at 16-17.

(5) Mr. Wu did not initially understand when FBI agents asked him about his upcoming school exam. *Id.*, at 25.

(6) Mr. Wu did not to understand what was being said when FBI agents told him about receiving discovery in the case. *Id.*, at 30-31.

(7) Mr. Wu did not to understand what was being said when FBI agents told him about his initial appearance. *Id.*, at 44.

Additionally, Mr. Wu's description of his earlier statements to the complainant as "threats" is attributable to the Brighton District Court judge having informed him that his statements constituted a threat, rather than Mr. Wu's own understanding of the term, where he never described his statements as such until the Judge, at some length and with some force, told him that they constituted a

Mr. Wu to custodial interrogation. What is clear, however, is that the FBI failed to provide Mr. Wu with the language assistance he required to fully appreciate what was being said to him and what was happening to him.

threat. *See Hearing Transcript,* attached as Exhibit 1, at 9. *See also FBI Interview Transcript*, attached as Exhibit 4, at 6 ("I went to the Court, I think, from November 18, and the – the Court – the Judge just told me that was a threat. What you said, what you did is a threat. I know that.").

Despite Mr. Wu's clearly limited understanding of the English language and American criminal legal system, the FBI failed to provide an interpreter to Mr. Wu during the interrogation. *See Wu Affidavit*, attached as Exhibit 3*; FBI Interview* Transcript, attached as Exhibit 4, at 1. Instead, FBI agents proceeded to interrogate Mr. Wu in a language and in a system that he did not fully understand. Where the agents' failure heightened the already "inherently coercive" environment of custodial interrogation, *see United States v. Cruz-Rivera*, 14 F.4th 32, 50 (1st Cir. 2021), and where Mr. Wu fully understood neither the language being spoken nor the process to which he was subject, his statements during the FBI's interrogation, including when he provided FBI agents with the passcode to his cellphone, were involuntary and, therefore, are inadmissible, as is any evidence obtained through use of the passcodes, such as the contents of his cellphone. *See Nix*, 467 U.S. at 441-442; *Clark*, 2023 WL 470652, at *6.

Although a search warrant for Mr. Wu's cell phone, an iPhone 13, may have been inevitable following his arrest, the FBI nevertheless would have been unable to access the contents of that phone without the passcode provided by Mr. Wu during his interrogation by FBI agents on December 14, 2022. Just four months ago in this District, an FBI agent testified, and the judge concluded, that the FBI

presently lacks the tools to access the data on either "an iPhone 12 or an iPhone 13" without knowing the defendant's passcode, such that the inevitable discovery doctrine did not apply. *US v. Clark*, 2023 WL 4706521 (D. Mass. July 21, 2023) ("[I]f biometric access is not enabled on an iPhone 12 or 13 running iOS 15, the FBI does not currently have the capability to access most data without a valid passcode").

### III.   Mr. Wu's statements during the hearing in Brighton District Court on November 18, 2022, were involuntary where Mr. Wu appeared *pro se,* did not understand he had a right under the Fifth Amendment not to answer the Judge's questions, was not provided with an interpreter and did not understand much of what was being said to and asked of him.

The Fifth Amendment right against self-incrimination (applicable to the States through the Fourteenth Amendment) "privileges [an individual] not to answer official questions put to him in any . . . proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 73-74, 77 (1973). Ordinarily, a "defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives." *Harrison v. United States*, 392 U.S. 219, 222 (1968). However, the waiver of such right implicit in an individual's testimony must be voluntary. *See United States v. Washington*, 431 U.S. 181, 187 (1977) ("[T]he Fifth Amendment proscribes only self-incrimination obtained by a 'genuine compulsion of testimony.'" (citation omitted)). "The constitutional guarantee is only that the witness be not compelled to give self-incriminating testimony. The test is whether, considering the totality of the circumstances, the free will of the witness was overborne." *Id*. at 188 (citing *Rogers*

*v. Richmond*, 365 U.S. 534, 544 (1961). In the context of providing consent to a search, the Supreme Court previously has held that "knowledge of the right to refuse consent is one factor to be taken into account" in determining whether consent was voluntary. *Scheckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). In the circumstances presented here, where Mr. Wu did not understand he had a Fifth Amendment right to invoke, to conclude that Mr. Wu voluntarily waived his Fifth Amendment right against self-incrimination when he testified at the hearing in Brighton District Court on November 18, 2022 would render such right ineffectual.

As noted above, when Mr. Wu appeared in Brighton District Court on November 18, 2022, he had had no prior experience with the United States legal system, civil or criminal. *See Wu Affidavit*, attached as Exhibit 3. He did not have the assistance of an attorney. *See Hearing Transcript*, attached as Exhibit 1, at 1. He had spent nearly the entirety of his life in a culture in which he would not have had the right to refuse to answer questions from a judge or other person in a position of authority. *See Wu Affidavit*, attached as Exhibit 3; *Belkin Report*, attached as Exhibit 6, at 5. As stated, "there is no explicit right to remain silent or to have counsel present *during any official questioning* of individuals in China." *Belkin Report*, attached as Exhibit 6, at 5 (emphasis added). Additionally, in the absence of a right to remain silent, a right to counsel, or a right to terminate questioning, a suspect or defendant may be interrogated by judges, in addition to police and prosecutors. *Id.* at 2-3

Here, Mr. Wu appeared *pro se* in a court system with which he had no prior experience, for a proceeding in a language in which he had – and continues to have – "significant limitations," and was questioned directly by the Judge – a government official in a position of authority. *See Hearing Transcript*, attached as Exhibit 1; *Wu Affidavit*, attached as Exhibit 3; *Chang Report*, attached as Exhibit 7, at 3; *Hearing Audio Recording*, attached as Exhibit 10. Moreover, the judge's tone could be described as forceful or scolding. *See Hearing Audio Recording*, attached as Exhibit 10. In the face of the court's authority, forcefully exercised against him, Mr. Wu did not know he had a right under the Fifth and Fourteenth Amendments to refuse to answer questions.

Mr. Wu's limited English proficiency and the court's failure to provide an interpreter for the proceedings resulted in Mr. Wu not fully understanding what was being said to or asked of him by the court. For example, Mr. Wu did not understand what was being asked when the court asked him about what was on the complainant's posters, leading to an almost nonsensical exchange. *See Hearing Transcript,* attached as Exhibit 1, at 6. Similarly, Mr. Wu initially did not understand when the court asked "what do you care if she does that or not? *Id.* at 7. Mr. Wu initially did not understand when asked where he goes to school. *Id.* at 10. Similarly, Mr. Wu did not understand when the court asked if he had "siblings," and only understood when the court clarified that "siblings" meant "brothers and sisters." *Id.* at 13.

All these circumstances combined to create a coercive environment in which Mr. Wu's will was overborne. *See Jackson*, 918 F.2d at 241. As a result, any purported waiver of his right against self-incrimination made by testifying in the court hearing was not knowing, and therefore, not voluntary. Additionally, where Mr. Wu often did not understand the questions being posed to him and instead complied with the court's authority, parroting back what the court said,[12] his answers to those questions were similarly involuntary. Therefore, his statements made at the hearing and any evidence obtained therefrom must be suppressed.

## CONCLUSION

Because Mr. Wu's post-arrest statements were taken in violation of *Miranda* and were involuntary, and because his statements in Roxbury District Court were also involuntary, his motion to suppress must be allowed. Mr. Wu respectfully requests an evidentiary hearing on this matter.

Respectfully Submitted,
**Xiaolei Wu**
By his attorneys,

/s/ Jessica Hedges
Jessica D. Hedges
BBO No. 645847
Hedges & Tumposky, LLP
88 Broad St., Suite 101
Boston, MA 02110
(617) 722-8220

---

[12] For example, Mr. Wu described a statement he allegedly made as "aggressive language." *See Hearing Transcript*, attached as Exhibit 1, at 9. The court instructed Mr. Wu at some length that the language at issue was "a little more than aggressive, concluding with instructing Mr. Wu that the alleged statement "is a threat." *Id*. Mr. Wu simply responded, "Okay." *Id*. The court deemed that response insufficient, asking, "What do you mean, okay? Do you get it?" *Id*. Mr. Wu then parroted back the court's language, stating, "I know that was a threat." *Id*.

/s/ Michael Tumposky
Michael Tumposky
BBO No. 660618
Hedges & Tumposky, LLP
88 Broad St., Suite 101
Boston, MA 02110
(617) 722-8220

/s/ Hannah Taylor
Hannah Taylor
BBO No. 710056
Hedges & Tumposky, LLP
88 Broad St., Suite 101
Boston, MA 02110
(617) 722-8220

## CERTIFICATE OF SERVICE

I, Jessica Hedges, hereby certify that, on November 28, 2023, I served a true copy of the above document on all counsel of record through the electronic case filing system.

/s/ Jessica Hedges
Jessica Hedges

## L.R. 7.1 CERTIFICATE

Undersigned counsel has conferred with the Government in good faith prior to filing this motion.

/s/ Jessica Hedges
Jessica Hedges