UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 23-cr-10005-DJC |
| | ) | |
| XIAOLEI WU, | ) | |
| | ) | |
| Defendant | ) | |

### GOVERNMENT'S OPPOSITION
### TO DEFENDANT'S MOTION TO SUPPRESS

The Motion to Suppress submitted by defendant Xiaolei Wu (the "Defendant") presents two primary arguments: first, that the Defendant's waiver of his *Miranda* rights prior to an FBI interview was not knowing, intelligent, and voluntary, because he had limited English proficiency, minimal knowledge of the U.S. legal system, and was confused by the explanation of his rights; and second, that statements made before a Judge of the Brighton District Court were the result of coercion which rendered them involuntary.

The Court should reject both arguments. The totality of the circumstances make it clear that the Defendant's waiver of his *Miranda* rights was done knowingly, intelligently, and voluntarily. Prior to entering the United States, the Defendant spent nearly four years as a student at Beijing Information Science & Technology University, where he studied English literature. A review of the relevant audio recordings and corresponding transcripts show that the Defendant understands and is conversant in English. He was provided a verbal recitation of his *Miranda* rights in a calm, non-confrontational tone, and received both a Chinese-language and an English-language version of a *Miranda* waiver form. After listening to and affirming that he understood

1

his rights, the Defendant signed the English-language form. For the next fifty minutes, he then had a cogent conversation with two FBI agents. Later that very same day, the Defendant was provided with an interpreter at his Initial Appearance before the Magistrate Judge, and nonetheless informed the Court that he would prefer to proceed without one. Under these circumstances, the Court should conclude that the Defendant's waiver of his *Miranda* rights was knowing, intelligent, and voluntary, and there is no basis to suppress his statements.

In addition, there is no basis in law to suppress the Defendant's statements before the Brighton District Court. A civil court hearing is the paradigmatic example of an "ordinary" case in which no *Miranda* warnings are required, and in which *Miranda*'s prophylactic remedies are unnecessary. To suppress the Defendant's statements to the Brighton District Court would contradict longstanding legal precedent, and there is no reason to do so here.

As a result, the Court should deny the Defendant's motion to suppress.

### **Relevant Facts**

On October 22, 2022, an individual ("Individual 1") posted a flier on a window at or near the Berklee College of Music in Boston, Massachusetts. Indictment, Dkt. No. 14, ¶ 7. The flier read:

> WE WANT FREEDOM
> WE WANT FOOD ON OUR TABLES
> WE WANT TO BREATHE
> WE WANT ART
> WE WANT DEMOCRACY
> WE WANT TO LOVE
> STAND WITH CHINESE PEOPLE

*Id.* After Individual 1 had posted a photograph of the flier to Instagram, the Defendant undertook a campaign to harass and threaten Individual 1. He told Individual 1 "don't you fucking post reactionary posters… Post more, I will chop your bastard hand(s) off… Not killed by pandemic

but about to be killed by Public Security." *Id.*, ¶ 8. He further told Individual 1 that he had "called the tipoff line in the country, the public security agency will go greet your family." *Id.*, ¶ 9. In so doing, he was indicating that he had alerted the security services of the People's Republic of China ("PRC") – an authoritarian regime that does not tolerate free speech – to Individual 1's actions. Additionally, the Defendant tried to find out where Individual 1 lived. *Id.*, ¶ 10. He told Individual 1 that they should not return to the PRC because Individual 1's actions would result in Individual 1 being "seize[d]" by PRC authorities ("I heard you are going back to the country. I think you should just cancel your ticket. I am afraid the customs may seize you, put all your family members through political review"). *Id.*, ¶ 11. He told Individual 1 that they did not "deserve to be Chinese. You don't deserve to hold a red cover passport. You should wash dishes for the capitalist dogs. Be careful that you get poked with a needle by a homeless person someday when you pass by south bay, then get eaten by someone." *Id*. He also posted Individual 1's email address on social media and said "let's all do it together." *Id.*, ¶ 12.

After the Defendant's actions described above, Individual 1 sought a restraining order against the Defendant. On November 18, 2022, the Defendant participated in a hearing with Individual 1 before the Brighton District Court in Brighton, Massachusetts, during which he provided sworn testimony. Def. Ex. 1, p. 3. During that hearing, the Defendant answered questions posed by the Judge and admitted that he understood that his statement "I'm going to chop your hands off" was a threat. *Id.*, p. 9; Def. Ex. 10.

On December 9, 2022, the Defendant was charged by complaint with Stalking, in violation of 18 U.S.C. § 2261A. Complaint, Dkt. No. 2. He was arrested on December 14, 2022. After he was arrested, he was interviewed by two FBI agents. Def. Ex. 4, Def. Ex. 9. Prior to being interviewed, he was provided with two *Miranda* waiver forms – one in English, and one in

simplified Chinese. Def. Ex. 4, p. 3; Def. Ex. 8; Def. Ex. 9, 2:02-2:12. He was given the opportunity to hold and review the waiver forms. Def Ex. 4, p. 3; Def. Ex. 9, 2:08. FBI Special Agent Kirk then proceeded to read the *Miranda* warnings to the Defendant. Def. Ex. 4, pp. 3-5; Def. Ex. 9, 2:40-3:26. He did so in an even, conversational, and non-confrontational tone. Def. Ex. 9, 2:40-3:26. He paused after each warning, giving the Defendant the opportunity to affirm his understanding of the warnings. *Id*. He repeatedly informed the Defendant that he had the right to talk to a lawyer. *Id*. Afterwards, the Defendant acknowledged that he understood the warnings and signed the English-language *Miranda* waiver. Def. Ex. 4, pp. 4-5; Def. Ex. 9, 3:27-4:09.

After waiving his *Miranda* rights, the Defendant was interviewed by the FBI agents for approximately 50 minutes. During the interview, the Defendant admitted that he sent Individual 1 the messages saying that he was "gonna chop off her hand," that he knew it was a threat, and that he threatened to report her to "public security" in the PRC. Def. Ex. 4, p. 6, 9; Def. Ex. 9, 6:27-6:31, 6:45-6:48, 10:20-10:50. He also provided the FBI with the passcode to his mobile device. Def. Ex. 4, pp. 22-23. On December 14, 2022, the United States sought and obtained a search warrant for that mobile device. Def. Ex. 5.

That same day, December 14, 2022, the Defendant made his Initial Appearance before the Magistrate Judge. At the Initial Appearance, a Mandarin Chinese interpreter was made available for the Defendant and was sworn in by the court. Gov't Ex. 1, pp. 3-4. The beginning of the Initial Appearance was conducted with the interpreter. *Id*., p. 4. Shortly afterwards, however, after conferring with the Defendant, defense counsel informed the Court: "I think my client is comfortable proceeding in English. There may be a few words that he doesn't understand, which is why we wanted to have the assistance of the interpreter, but he's having trouble. I think it's not assisting him right now." *Id*., pp. 4-5. The Court then informed the interpreter that "what we're

going to do is proceed in English, and if Mr. Wu does not understand something, he will listen to you and then you can help him to understand whatever it is he's not getting." *Id*., p. 5. The Court also asked the Defendant whether it was "okay with you if we go forward like this." *Id.* The Defendant responded, in English, "Okay." *Id*. The remainder of the Initial Appearance was conducted in English. *Id.,* pp. 5-12. At no point did the Defendant ask for clarifications or say that he could not understand. *Id*. He answered, in English, all questions posed to him. *Id.*

On January 10, 2023, the Defendant was indicted on one count of Stalking, in violation of 18 U.S.C. § 2261A, and one count of making an Interstate Transmission of a Threatening Communication, in violation of 18 U.S.C. § 875(c).

On November 28, 2023, the Defendant filed a motion to suppress the statements he made to the FBI (including the providing of his mobile device passcode and any evidence derived from that mobile device), and to suppress the statements he made before the Brighton District Court. Dkt. No. 44 ("Def. Motion").

## Argument

I. **The Defendant's Statements on December 14, 2022 Were Knowing, Intelligent, and Voluntary, and Should Not Be Suppressed.**

It is well established that law enforcement officers must give *Miranda* warnings before interrogating an individual who is "taken into custody or otherwise deprived of his freedom of action in any significant way." *Stansbury v. California,* 511 U.S. 318, 322 (1994) (internal quotation marks omitted). After being advised of his *Miranda* rights, the accused may "validly waive his right to remain silent and his right to counsel and respond to questions." *U.S. v. Garcia*, 983 F. 2d 1160, 1169 (1st Cir. 1993). A voluntary waiver is "the product of free and deliberate choice, rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  A knowing and intelligent waiver is one that is made "with a full awareness of both the

nature of the right being abandoned and the consequences of the decision to abandon it." *Id*. The analysis of whether a *Miranda* waiver was voluntary, knowing, and intelligent is made based on the "totality of the circumstances surrounding the interrogation." *Id.* Here, the Defendant advances three principal reasons why his *Miranda* waiver was not voluntary, knowing, and intelligent: (1) the Defendant had limited English proficiency; (2) the explanation of the rights to the Defendant was confusing or flawed; and (3) the Defendant had minimal knowledge of the U.S. legal system. The totality of the circumstances, however, indicate that the Defendant made a voluntary, knowing, and intelligent waiver of his *Miranda* rights. The evidence shows that the Defendant speaks and understands English, and that he understood the *Miranda* rights that were both read and provided to him. After being advised of those rights, and provided with his rights in writing in *both* Chinese and English, the Defendant validly decided to waive them by signing the English-language *Miranda* waiver form.

### A. The Totality of the Circumstances Show that the Defendant's *Miranda* Waiver was Knowing, Intelligent, and Voluntary.

#### *The Defendant Was Advised of His* Miranda *Rights*

As a threshold matter, the Defendant was advised of his *Miranda* rights in both Chinese and English. He was provided with both "simplified Chinese" language and English language written versions of the *Miranda* rights. Def. Exs. 4, 8. The Defendant was also read these rights in English by Special Agent Kirk. Def. Ex. 4. Special Agent Kirk paused repeatedly while reading the rights to the Defendant, and delivered them in an even, calm, non-confrontational manner. The Defendant responded that he understood these rights. *Id*. The following exchange then occurred:

> SA Kirk:       All right. And then the bottom portion says, waiver rights. I have read the statement of my rights, and I understand what my rights are. At this time, I'm willing to answer questions without a lawyer present.

Defendant:     Okay.

SA Kirk:       So you would like to answer questions right now?

Defendant:     I'll just sign.

Def. Ex. 4, pp. 4-5. The Defendant then proceeded to sign the waiver form in English. *See U.S. v. Luciano*, 329 F.3d 1, 8 (1st Cir. 2003) (rejecting claim that defendant had not understood a *Miranda* waiver because of the "damning" evidence that included "the written, signed consent form executed by [the defendant] himself," which had been read out loud to the defendant by law enforcement, which had been read by the defendant, and which the defendant affirmatively indicated he understood). Contrary to the Defendant's claims, the form itself was neither confusing nor ambiguous in this context. In *U.S. v. Clark*, cited by the Defendant, the District Court found that the form had shortcomings in a scenario where the Defendant "did not mark [the signature line] in any way," where there "was no evidence that Defendant was actually looking at the document to observe its format or read along… no recording of the interaction or testimony to explain how the agent enunciated, phrased, or punctuated the content of the form when reading it to the Defendant," and where "Defendant remained handcuffed, although deemed a low risk, and was not allowed to actually write on the form." *U.S. v. Clark*, 2023 WL 4706521 at *4 (D. Mass. July 21, 2023). Here, by contrast, as is made clear by the recorded interview, the Defendant had both the English and Chinese language forms in front of him,[1] was read and acknowledged the forms, and subsequently signed the English version of the form himself.

---

[1] In fact, the record indicates that the Defendant was provided a *Miranda* waiver form to hold while it was read to him – Special Agent Kirk stated during the interview "But this is what I'm going to be reading in English, in simplified Chinese, if you like to hold that copy." Def. Ex. 4, p. 3; *see also* Def. Ex. 9, 2:00-2:11.

<u>*The Defendant Understood English*</u>

The Defendant argues, nonetheless, that his waiver was not valid because he did not have sufficient understanding of English. To begin, the mere failure to provide *Miranda* warnings in a suspect's primary language does not render a statement unknowing, *even* in circumstances where a defendant's English language skills are limited.[2] *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2nd Cir. 1989) ("Even though his proficiency in the English language may have been limited, it did not prevent [the defendant] from making a knowing and intelligent waiver of his constitutional rights" where the evidence showed that although the Defendant spoke broken English and occasionally lapsed into Spanish, he indicated on each occasion that he was advised of his rights and that he understood them); *see also Perri v. Director*, 817 F.2d 48, 452-53 (7th Cir. 1987) (rejecting the defendant's claim that language barriers prevented an understanding of rights); *U.S. v. Checo,* 21-cr-10195-IT, Dkt. No. 91 at *29 (D. Mass. April 26, 2023) ("no requirement" to confirm a defendant's English reading comprehension "where [defendant] had communicated effectively in English throughout the interrogation, and orally affirmed her understanding of the *Miranda* rights provided to her"); *U.S. v. Vongkaysone*, 2004 WL 2011447 at *14 (D. Me. Sept. 9, 2004) (English-language *Miranda* waiver was valid where there was no indication that the defendant suffered from language difficulties, did not ask for a translator, and did not otherwise signal that he was having trouble understanding); *U.S. v. De Yian*, 1995 WL 422019 at *3

---

[2] The Defendant hardly grapples with the fact that he was also provided a *Miranda* waiver form in Chinese, his native language. The Defendant states that he was not provided with an opportunity to read it himself and was not asked if he had read it, and as a result "was not advised of his rights in his native language." Def. Motion at 20-21. But he *was* advised of those rights via the written form, and the record suggests that it was given to him to hold in his hands. Def. Ex. 4, p. 3; *see* FN 1. Furthermore, *even if* he did not review the Chinese form, the record indicates that it was because he was sufficiently proficient in English to understand without needing to refer to the Chinese language document.

(S.D.N.Y. July 18, 1995) (defendant's English-language *Miranda* waiver was knowing where he was able to converse with people who spoke only English, no one could tell he could not understand English, and he did not say he was having trouble understanding). Similarly, less than perfect English comprehension does not render a waiver involuntary. *See Luciano*, 329 F.3d at 7-8 (rejecting defendant's argument that confession was involuntary due to a lack of English comprehension where the interrogation transcript indicated that he understood English, the defendant had spent years in the United States, and the defendant had corrected the court interpreter as he translated); *U.S. v. Avila*, 2019 WL 4034820 at *4 (D. Mass. Aug. 27, 2019) (rejecting defendant's argument that confession was involuntary due to a lack of English skills where he testified competently in English at a court hearing, the transcript indicated his ability to understand the agents and express hesitation or uncertainty when he did not understand or have an answer to a question, and where he worked at a company in which he communicates in English); *cf. U.S. v. Mahmood*, 415 F. Supp. 2d 13, 19 (D. Mass. 2006) (confession involuntary where the defendant's grasp of English was "tentative" and "he did not often understand the questions put to him").

In this case, the evidence makes clear that the Defendant understood English sufficiently to make a valid waiver of his *Miranda* rights.[3] When asked if he understood his rights, the Defendant repeatedly affirmed that he did. The Defendant's subsequent interview (all of which was in English) confirmed that he was proficient in English. This is readily apparent upon review

---

[3] The Defendant relies heavily on *U.S. v. Garibay*, 143 F.3d 534 (9th Cir. 1998). But it is clear that the defendant in *Garibay* was far less proficient in English than the Defendant here, and unlike the Defendant here, Garibay had significant intellectual limitations. In *Garibay*, the record showed that the defendant had not graduated from high school, communicated almost entirely in Spanish, had an IQ that was "borderline retarded," and had "difficulty understanding the English language." Furthermore, in *Garibay*, whenever the defendant tried to communicate in Spanish with the agent conducting the interrogation, the agent told the defendant "to just say yes or no." *Garibay*, 143 F.3d at 537-38, and n.5.

of the audio recording of the FBI interview of the Defendant. Def. Ex 9. From beginning to end, the Defendant was responsive to the FBI's questions. He clearly understood the questions posed to him, and expressed himself *in English* in response to those questions. *See United States v. Abou-Saada*, 785 F.2d 1, 10 (1st Cir. 1986) (upholding denial of motion to suppress statements where defendant spoke English well enough to answer officers' questions coherently); *see also Capaneria*, 891 F.2d at 1020 (finding that the record, including recording of interview with defendant in English, showed that the defendant's "command of English was sufficient for him to have understood the *Miranda* warnings given to him"). A short excerpt of the interview from shortly after the Defendant signed the *Miranda* waiver makes it clear that the Defendant understood the questions and was able to respond in English:

| | |
|---|---|
| SA Kirk: | Okay. Where did you see this poster originally? |
| Defendant: | I think it's in 150 Massachusetts Avenue. |
| SA Kirk: | Okay. |
| Defendant: | A lot of – a lot of this things is on all the campus. |
| SA Kirk: | Okay, so you saw this poster, and what was your reaction to that poster? |
| Defendant: | I feel angry of that. You are from China and you post this. This is a lot of political scholar things in China. What she did, she posted, the poster is forbidden in China, but right now, in here is okay. |
| SA Kirk: | Yes. |
| Defendant: | And most of them, I think the average student from the China mainland got to hate her, what she did. |
| SA Kirk: | Okay, so you were angry that she posted criticism of – |
| Defendant: | Yeah. Pretty angry with that. |

| | |
|---|---|
| SA Kirk: | Are you yourself a member of the Chinese government or, like, in the Chinese Communist Party? And it upsets you that you criticized it? |
| Defendant: | No, I'm not like a member of the [CCP] or something. I just love my country. |

Def. Ex. 4, pp. 5-6; Def. Ex. 9, 5:00-6:08.

Despite this, in his Motion the Defendant points to several statements within the FBI interview as evidence that he did not understand the questions being posed. *See* Def. Ex. 7, p. 4. But none of these examples indicate that the Defendant could not understand English – in fact, they provide evidence that he *did* understand English and could engage in nuanced conversations in that language:

- In the first example, Special Agent Allen asked "What would happen to [the plaintiff's] family" in China, and the Defendant responded by denying that he did anything to the family. In his Motion, the Defendant claims that he did "not appropriately address the original question." But the mere fact that the Defendant did not answer the question directly is not evidence of his lack of understanding – to the contrary, individuals frequently fail to respond to direct questioning, especially where, as here, a direct answer may paint the Defendant's actions in a negative light.

- In the second example, Special Agent Kirk asked "How'd you figure out you had the wrong address then?" The Defendant responded "The wrong address right now?" In his Motion the Defendant claims that this necessity for "clarification" indicates a lack of understanding, but it also indicates that the Defendant *knew* when he did not understand a question, and *knew* how to ask a clarifying question in order to understand the question he was asked.[4]

- In the third example, Special Agent Kirk asked "What were you planning on doing with the student records if you could get your hands on it?" In response, the Defendant ultimately said, "I don't know, I didn't do that," and "No, I'm not asking for them. I never – I never asking anyone to get her student records." In his Motion, the Defendant claims that his response indicates that he did not understand the question even after "a couple of repetitions and clarifications." However, a review of the recording of the interview indicates that the Defendant understood the question, but that he denied that

---

[4] *See also* Def. Ex. 4, p. 22:
SA Kirk: So you were just so upset about this that you ended up doing all these follow on things.
Defendant: Oh, what – beg your pardon?

> he engaged in the conduct prefaced in the question.  In other words, the Defendant
> *denied* doing what the agents were asking him about – *i.e.,* that he tried to get her
> student records – indicating that his confusion was not a lack of understanding of
> English, but rather a lack of knowledge about the factual scenario they were
> confronting him with.

*Id.*; Def. Ex. 4, p. 10-11, 15, 16; Def. Ex. 9, 10:50-11:00, 16:54-17:00, 18:18-18:58. In other words, the Defendant points to only three instances within an almost hour-long interview where he *now* claims not to have understood the question – and even those demonstrate the Defendant's proficiency with English.

Furthermore, the report of Dr. Charles Chang provided by the Defendant about his English language proficiency (Def. Ex. 7) should be given no weight. It is not surprising that the Defendant performed poorly on an examination where it was in his interest to do so. And based on the report itself, Dr. Chang did not provide any guardrails to ensure or take into account any such "malingering" by the Defendant. *See Checo,* 21-cr-10195-IT, Dkt. No. 91 at *27-28 (refusing to admit testimony regarding language comprehension as "not based on reliable methods where the test to detect malingering was not built into" the language comprehension test); *U.S. v. De La Cruz,* 2022 WL 88168 at *13 (D. Conn. Jan. 7, 2022) (rejecting conclusions rendered by doctor who concluded that defendant did not understand *Miranda* warnings where the doctor did not test for "malingering" on the part of the Defendant); *U.S. v. Arias*, 1996 WL 35049342 at *1 (S.D. Fl. Jan. 19, 1996) (same); *cf. U.S. v. Louissant*, 2012 WL 12946876 at *2 (S.D. Fl. Sept. 7, 2012) (doctor did account for malingering). Not only that, but the report mischaracterizes the Defendant's FBI interview when it states that "there is a reasonably high chance that [Defendant] did not fully understand the Miranda warning during the FBI interview and did not fully understand all of the questions asked of him and statements made to him… by the agents during the FBI interview, *all of which were delivered to him in spoken English.*" Def. Ex. 7, p. 5 (emphasis added). To the

contrary, the *Miranda* warnings were delivered in spoken English, written English, and written Chinese, raising the prospect that Dr. Chang was not fully informed of the facts. In short, Dr. Chang's report is not reliable.

The Defendant's own conduct at his Initial Appearance also makes it abundantly clear that he understands English and did not need an interpreter. To the contrary, after conferring with the Defendant, defense counsel stated that the interpreter was not only unnecessary, but was causing "trouble" for the Defendant's ability to understand and was "not assisting him." Gov't. Ex. 1, pp. 4-5. The Defendant agreed that he did not need an interpreter, and subsequently participated in the entire hearing in English. *Id*.

Lastly, the Defendant stated on his Non-Immigrant Visa application that he attended the Beijing Information Science & Technology University from September 1, 2016 through July 1, 2020, and that while there his "Course of Study" was "English Literature." Gov't Ex. 2, p. 6. Furthermore, the application "case notes," dated June 21, 2021, indicated that the Defendant speaks "Good English." *Id*., p. 3. And the Defendant's own transcript from Beijing Information Science & Technology University indicates that he took numerous English language courses, including Advanced English Writing, Advanced English III, and Advanced English Skills – Listening. Gov't Ex. 3. In other words, the record makes it abundantly clear that the Defendant understands and is conversant in English.

### *The Defendant Understood His* Miranda *Rights*

The Defendant also claims that his lack of familiarity with the American legal system requires the suppression of his statements. Def. Motion at 19, 25-26. This argument is belied by two facts. First, unlike the defendant in *Mahmood* (upon which the Defendant relies), the Defendant here was provided with *Miranda* warnings (both verbally, and in writing in both

Chinese and English).   Also, here, unlike in *Mahmood*, after being provided with *Miranda* warnings verbally and in writing, the Defendant voluntarily signed the *Miranda* waiver form. *See U.S. v. Mahmood*, 415 F. Supp. 2d. 13, 16 (D. Mass. 2006) (considering the defendant's lack of experience with the legal system in a context where the defendant had not been provided with *Miranda* warnings). The delivery of *Miranda* warnings is precisely the type of curative action for which *Miranda* was intended – providing knowledge and understanding of rights where a defendant may have lacked familiarity.

Second, at the outset of the interview, the Defendant posed a question which indicated that he *was* at least somewhat familiar with rights provided under the U.S. legal system:

| Defendant: | This afternoon is the Judge? |
|---|---|
| SA Kirk: | Yeah. So – |
| Defendant: | I go for what? |
| SA Allen: | A Federal Judge. |
| Defendant: | I don't have lawyer? |

Def. Ex. 4, pp. 2-3; Def Ex. 9, 1:12-1:20. In other words, the Defendant was asking whether he would be given a lawyer at the subsequent hearing to take place later that afternoon before a judge. The question is incompatible with a person who had "little familiarity with… the United States criminal legal system."

The Defendant also claims that Special Agent Kirk's response to the Defendant's question about a lawyer misled the Defendant as to his rights. Def. Motion at 21. But the Defendant was not inquiring as to whether he could have a lawyer during the FBI interview. Rather, the context of the conversation clearly indicates that the Defendant was asking whether he would be given a lawyer for the hearing later that afternoon. Special Agent Kirk's answer was an accurate one:

| SA Kirk: | So if you can't afford a lawyer, one could be provided for you down the line. And all that's going to be explained when you see the Judge. For this, we are just sitting down with you real quick, seeing if you want to give your side of the story regarding why we arrested you. But before I can explain any of that, we have to read you this form right here. And then if you want to talk for five minutes or an hour, it's up to you; right? You can stop the interview at any point. If you don't want to talk, you don't have to talk; right? |

Def. Ex. 4, p. 4; Def. Ex. 9, 1:20-2:00. Special Agent Kirk's response to the Defendant's question was accurate – if the Defendant could not afford a lawyer for the upcoming hearing, one could be provided for him. And at this stage, prior to reading the Defendant his *Miranda* rights, Special Agent Kirk made it clear that the Defendant did not have to talk if he did not want to. *Id.*

In addition, to the extent there was *any* confusion about the Defendant's right to a lawyer, it was repeatedly cleared up by the conversation which immediately followed:

| SA Kirk: | All right, so like I said, in the United States, before we ask you any questions about the crime that we believe you committed, we have to read you your rights if we arrest you. Right? So I'm just going to go down each one of these lines, and then all I need for you is to say that you understand what was read to you. And then at the end, **you can say whether or not you want to talk to a lawyer.** Does that make sense? |
| Defendant: | Uh-huh. |
| … | |
| SA Kirk: | All right. **You have the right to talk to a lawyer for advice before we ask you any questions.** Do you understand? |
| Defendant: | Uh-huh. |
| SA Kirk: | All right. If you cannot afford a lawyer, **one will be appointed for you before any questioning if you wish.** Do you understand? |

15

| | | |
|---|---|---|
| Defendant: | Okay. | |
| SA Kirk: | If you decide to answer questions now ***without a lawyer present, you have the right to stop answering at any time***. | |
| | All right. And then the bottom portion says, waiver rights. I have read the statement of my rights, and I understand what my rights are. ***At this time, I'm willing to answer questions without a lawyer present.*** | |
| Defendant: | Okay. | |
| SA Kirk: | So would you like to answer questions right now? | |
| Defendant: | I'll just sign. | |

*Def. Ex. 4*, pp. 4-5 (emphases added); *Def. Ex. 9*, 2:10-3:45. Listening to the recording also makes it clear that Special Agent Kirk provided the *Miranda* warnings in an even, conversational, and non-confrontational tone, and that the Defendant acknowledged repeatedly along the way that he understood. Thus, to the extent the Defendant lacked any familiarity with the U.S. legal system, or was confused by Special Agent Kirk's initial response to his question about a lawyer, the conversation that followed indicates that the Defendant nonetheless clearly affirmed that he understood the rights afforded him by *Miranda*, and proceeded to knowingly, intelligently, and voluntarily waive those rights.

**B. The Phone Passcode Should Not Be Suppressed.**

The Defendant also argues that the mobile device passcode, which he provided to the FBI, should be suppressed as well. As a threshold matter, the same analysis applied above to the Defendant's statements to the FBI applies equally to the passcode. Because the Defendant made a knowing, intelligent, and voluntary waiver of his rights, the Defendant's statement regarding his

16

mobile device passcode should not be suppressed, nor should any evidence obtained from that mobile device.

Furthermore, even if the passcode were suppressed, the doctrine of inevitable discovery should preclude the suppression of evidence obtained from the Defendant's mobile device. *See Clark*, 2023 WL 4706521 at *7 (declining to suppress evidence obtained from a defendant's laptop where the evidence established that even if the FBI had not obtained the Defendant's passcodes, there was a "high probability" that the FBI would have otherwise been able to access the user data on the laptop); *see also Nix v. Williams*, 467 U.S. 431, 444 (1984) ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . the evidence should be received."); *United States v. Zapata,* 18 F.3d 971, 978 (1st Cir. 1994) (application of the inevitable discovery rule requires that the government establish "(i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment.").[5]  Contrary to Defendant's representation, the FBI is capable of obtaining a large amount of data from an iPhone 13 without a passcode, including text messages, messages from third party messaging applications, photos, media, images, and video. *See* Gov't Ex. 4. As a result, even without the Defendant supplying the passcode, the government would have been able to access relevant communications and records from the Defendant's mobile device. The doctrine of inevitable discovery applies to those items, and they should not be suppressed.

---

[5]  "Although first applied in the Fourth Amendment context, the inevitable discovery doctrine applies with equal force to potential Fifth Amendment violations." *U.S. v. Hilton,* 625 Fed.Appx. 754, 759 (6th Cir. 2015); *accord U.S. v. Griffin,* 48 F.3d 1147, 1150 (10th Cir. 1995) (observing that "inevitable discovery doctrine allows the introduction of evidence acquired in violation of a defendant's Fourth, Fifth, or Sixth Amendment rights").

II.     **There Is No Basis to Suppress the Defendant's Statements Before the Brighton District Court.**

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." The right provides a privilege in both criminal cases as well as in civil proceedings where the statements might lead to incrimination in a future criminal proceeding. *See Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973). With few exceptions, an individual must invoke the privilege to claim its protection. *See Minnesota v. Murphy*, 465 U.S. 420, 427 (1984). In a civil proceeding, any Fifth Amendment privilege must be asserted on a question-by-question basis. *See U.S. v. Bodwell*, 66 F.3d 1000, 1001 (9th Cir. 1995). Requiring a question-by-question invocation allows the court to review the privilege claim at the time it is made and determine its validity. The procedure is important because the Fifth Amendment only prevents compelled testimony that would incriminate the witness, but does not preclude testimony which the witness wishes simply not to provide. *See Roberts v. U.S.,* 445 U.S. 552, 560 n.7 (1980).

The Supreme Court has recognized two exceptions to the express invocation rule. *See Salinas v. Texas*, 570 U.S. 178, 184-85 (2013). The first exception prevents the defendant's failure to testify at his own criminal trial from being held against him. *See Griffin v. California*, 380 U.S. 609, 613-14 (1965). The second exception provides that a witness' failure to invoke the privilege must be excused where "government coercion makes his forfeiture of the privilege involuntary." *Salinas*, 570 U.S. at 184-85. This type of coercion is most commonly recognized in the context of a custodial interrogation, but may also include statements where the government impermissibly attaches a penalty to the invocation of the privilege. *Id.* at 185; *see, e.g., Garitty v. New Jersey*, 385 U.S. 493, 497 (1967) (forfeiture of public employment upon invocation); *Lefkowitz*, 414 U.S. at 84-85 (forfeiture of public office upon invocation); *Murphy*, 465 U.S. at 534 (revocation of

probation). The doctrine also permits a witness to exercise the privilege through silence. *Salinas*, 570 U.S. at 185.

In this case, the Defendant did not invoke a Fifth Amendment privilege during his testimony before the Brighton District Court on November 18, 2022. Thus, his statements may be suppressed *only* if they involved (1) the Defendant's failure to testify at his own criminal trial, or (2) sufficient government coercion that made the Defendant's failure to invoke the privilege involuntary.

The first exception is clearly inapplicable in this case. Nor does the second exception apply. "[I]n the ordinary case, if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself." *Garner v. U.S.*, 424 U.S. 648, 654 (1976). The courtroom "is not the type of setting that would justify invoking *Miranda*'s prophylactic rule." *U.S. v. Kilgroe*, 959 F.2d 802, 804-05 (9th Cir. 1992). And as the First Circuit has held, "logic and an unbroken skein of authority – our own case law, cogent opinions from sister circuits, and analogous Supreme Court precedent – point unerringly to the conclusion that self-incriminating statements made by witnesses (whether or not subpoenaed) while testifying in judicial proceedings are admissible against them in later prosecutions." *U.S. v. Melendez*, 228 F.3d 19, 23 (1st Cir. 2000). This is precisely that type of case. The Defendant was not in custody – he was present at a routine court hearing regarding a restraining order. He was questioned by a Judge, not a member of law enforcement. Nor was there any penalty attached to the defendant's invocation of the privilege against self-incrimination. To suppress the Defendant's statements made before the Brighton District Court would flatly contradict existing precedent, and the court should not do so here.

### *Conclusion*

It is abundantly clear from the audio recordings, and the corresponding transcripts of those recordings, that the Defendant understands and is conversant in English. Prior to the FBI interview, he was provided a verbal recitation of his *Miranda* rights in a calm, non-confrontational tone, and given both a Chinese-language and an English-language version of a *Miranda* waiver form. The Defendant listened to and repeatedly affirmed that he understood his rights. He signed the English-language waiver form. He had a cogent conversation *in English* for approximately fifty minutes. Under these circumstances, there is no basis to suppress his statements. Furthermore, to suppress the Defendant's statements to the Brighton District Court would contradict longstanding legal precedent, and the Defendant has provided no basis for doing so.

For the reasons stated herein, the Defendant's Motion to Suppress should be denied without a hearing.

Date: December 12, 2023                    Respectfully submitted,

                                           JOSHUA S. LEVY
                                           Acting United States Attorney

                              By:     */s/ Timothy H. Kistner*
                                           TIMOTHY H. KISTNER
                                           ALATHEA PORTER
                                           Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Timothy H. Kistner*
TIMOTHY H. KISTNER
Assistant United States Attorney

Date: December 12, 2023