UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Docket No. 1:23-cr-10005-DJC |
| | ) | |
| | ) | |
| XIAOLEI WU | ) | |

**DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION TO HIS MOTION TO SUPPRESS**

The defendant, Xiaolei Wu, submits this reply to the Government's opposition to his motion to suppress.

**ARGUMENT**

**I. Dr. Chang's expert opinion of Mr. Wu's English language limitations properly considered whether Mr. Wu was "malingering," and was based on full knowledge of the relevant facts, rendering his report reliable.**

The Government asserts in its opposition that Dr. Chang's expert report should be given no weight where it is not based on reliable methods and "mischaracterized" the FBI interview. *Gov't Opp.*, ECF no. 50, at 12-13. The Government further suggested that Dr. Chang was not fully informed of the facts surrounding the interview. *Id.* These arguments are without merit.

First, the Government does not contest Dr. Chang's qualifications as an expert. Second, as indicated in his expert report, Dr. Chang's opinion on Mr. Wu's English language limitations is not based solely on the results of the Oral Proficiency Interview (OPI), but also on Dr. Chang's detailed review of the

1

transcript of the Brighton District Court hearing on November 18, 2022, and the complete audio recording of the FBI interrogation on December 14, 2022, as well as a comparison of Mr. Wu's language use in all three sources. *See Chang Report*, Exhibit 7 to Mtn. to Suppress, ECF no. 44, at 3-4. *See also Chang Report Addendum*, attached as Exhibit 1, at 1. In the addendum to his report, Dr. Chang noted that his "opinion synthesizes data gathered from all of these sources, each of which [he] consider[s] to provide reliable information about Mr. Wu's proficiency." *See Exhibit 1*, at 1. As Dr. Chang has observed, it was not in Mr. Wu's interest to misapprehend what was being said to or asked of him at the Brighton Court hearing or during the FBI interrogation. *Id*. Thus, these proceedings are reliable representations of Mr. Wu's actual language abilities and limitations and are, therefore, useful comparators to Mr. Wu's language use in the OPI. As such, they serve as the "guardrails" to any potential malingering during the OPI.

As a result of Dr. Chang's review and comparison of all three sources, he opined that it is not plausible to attribute malingering to Mr. Wu's performance in the OPI. *Id*. First, Mr. Wu's misapprehensions in the OPI were both internally consistent (i.e., consistent throughout the OPI itself), as well as consistent with the types of misapprehensions observed in the Brighton Court hearing and FBI interrogation. *Id*. If Mr. Wu were "malingering," or faking misapprehension, in the OPI, Dr. Chang noted that one would expect his errors to be either or both internally inconsistent (i.e., seeming random and inconsistent within the OPI

2

interview itself), or externally inconsistent with the types of errors made at the court hearing and in the FBI interrogation. *Id*. Dr. Chang observed neither*Id.*

Further, Dr. Chang did not, as the Government suggests, mischaracterize the FBI interrogation in opining that "there is a reasonably high chance that [Mr. Wu] did not fully understand the Miranda warning[, or] . . . all of the questions asked of him and statements made to him by . . . the agents during the FBI interview, all of which were delivered to him in spoken English." *See Chang Report*, Exhibit 7 to Mtn. to Suppress, ECF no. 44, at 12. As noted, this opinion was based on the OPI and detailed review of both the Brighton Court hearing transcript and full audio recording of the FBI interrogation. Dr. Chang was additionally provided with the Miranda warning form given to Mr. Wu "to hold" during the FBI interrogation. *See Exhibit 1*, at 2; *FBI Interview Transcript*, Exhibit 4 to Mtn. to Suppress, ECF no. 44, at 3. In particular, in reviewing the audio recording of the interrogation, Dr. Chang observed a "lack of an audible period of silence following the provision of the written forms[.]" *Exhibit 1*, at 2. This fact, coupled with "the length and complexity of the written warnings, in both languages," led Dr. Chang to opine that Mr. Wu could not have "carefully read through either of the forms, much less both[,]" and thus, Mr. Wu "effectively did not access the warnings in written form" such that "his understanding of the Miranda warning was based on the spoken interaction with the interviewers." *Exhibit 1*, at 2.

Finally, the OPI that Dr. Chang used here has been relied on by courts. In *United States v. Al-Saimari*, 982 F. Supp. 2d. 1285 (D. Utah 2013),[1] the court concluded that the Government had failed to demonstrate by a preponderance of the evidence that the defendant had made a knowing and voluntary waiver of his *Miranda* rights and granted his motion to suppress his statements to law enforcement. The court observed that, although the defendant was "able to maintain a simple conversation and underst[oo]d many of [the FBI agent's] questions," his "answers [were] generally short and he [was] sometimes non-responsive."[2] *Id*. at 1290-1291. Additionally, the court relied on an expert opinion as to the defendant's English language limitations which was based on the OPI, another comprehension exam, and review of the defendant's interview with law enforcement. *Id.* at 1291. The court noted that the OPI, which is a peer-reviewed linguistics test, is "an accepted means of measuring a non-native speaker's language proficiency." *Id.* at 1291.

In addition, Dr. Chang's opinion appropriately took into consideration potential "malingering" by Mr. Wu where he considered both the internal

---

[1] *See also United States v. Garcia*, 3:19-cr-29, 2019 WL 4195345, at (E.D. Va. Sept. 4, 2019) (OPI test and related expert report provided evidence of defendant's English proficiency in 2019, when administered, but did not assess such skills in 2010).

[2] Although the Government's overall argument suggests that, where Mr. Wu understands and speaks *some* English, he must necessarily understand everything, common sense belies such an inference. This argument relies on the false premise that language comprehension and acquisition is a binary. There are not solely two options for language comprehension or acquisition: none or fluency. The federal government's own use of the phrase "limited English proficient individuals" reveals an understanding that a person may have *some* level of proficiency, but not enough to fully understand interactions with law enforcement or to justify failure to provide language support to that person. *See* U.S. Dep't of Just.*, Justice Department Announces New Language Access Law Enforcement Initiative* (Dec. 19, 2022), https://www.justice.gov/opa/pr/justice-department-announces-new-language-access-law-enforcement-initiative.

4

consistency of Mr. Wu's language errors and the external consistency of such errors across the various sources Dr. Chang reviewed, including both the transcript of the Brighton Court hearing and the audio recording of the FBI interrogation. As such, Dr. Chang's expert report and conclusion is reliable and entitled to weight by this Court.

II. **Mr. Wu's responses during the FBI interrogation and court hearing in simple present or past tense to hypothetical questions about what "would" or "could" happen if a hypothetical condition were first met do not suggest understanding of the questions asked, and were consistent with his demonstrated inability to understand and answer hypothetical questions during Dr. Chang's evaluation.**

The Government suggests in its opposition that Mr. Wu's response in simple present or past tense to hypothetical questions were not examples of misunderstandings. *Gov't Opp.*, ECF no. 50, at 11-12. This argument is implausible where Mr. Wu's inability to understand a hypothetical question was consistently demonstrated across the FBI interrogation, the Brighton Court hearing, and the OPI. *See Exhibit 1*, at 2. Additionally, that Mr. Wu may, on occasion, signal misunderstanding by saying, "what" or something similar, Dr. Chang observed that this is not always the case. *See Chang Report*, Exhibit 7 to Mtn. to Suppress, ECF no. 44, at 3 (Mr. Wu "does not necessarily recognize or act when he has failed to understand something, and he may let the conversation proceed in the hopes that he will pick up things he missed later on in the conversation").

For example, Mr. Wu incorrectly responded, "Yeah," to "In the United States, do we follow Chinese law?" *See FBI Interview Transcript*, Exhibit 4 to Mtn. to

5

Suppress, ECF no. 44, at 12. Later, Special Agent Kirk stated that Mr. Wu was asking if anyone had access to the complainant's student record and then asked, "What were you hoping somebody would reply saying, yes, here's everything?" *Id*. at 16. Instead of asking a clarifying question or providing a responsive answer, Mr. Wu responded nonsensically with, "Yeah, this is my motherfucker, or something like that. Yes." *Id*. As another example, Special Agent Kirk at one point asked Mr. Wu about his upcoming exam at Berklee, asking "Is it like you're playing a musical piece, or how's that work?" *Id*. at 25. Without indicating lack of understanding, Mr. Wu provided the nonresponsive answer, "No, I do jazz. I play jazz." *Id*.

Thus, although Mr. Wu occasionally may ask a clarifying question if he does not understand something, he does not always do so. As a result, one cannot conclude based on the occasional, "what," on the audio recording that any absence of such an exclamation definitively demonstrates understanding of what was said, particular where an answer is nonresponsive to the question or statement to which it relates.

### III. The Government misrepresented the number of misunderstandings during the FBI interrogation that Mr. Wu identified and discussed in his motion to suppress.

The Government asserts in its opposition that Mr. Wu "points to only three instances within an almost hour-long interview where he *now* claims not to have understood the question." *Gov't Opp.*, ECF no. 50, At 12.  This is false. First, Mr. Wu identified seven such misunderstandings. *See Mtn. to Suppress*, ECF no. 44, at 27 (providing numbered list of seven misunderstandings). Moreover, many of these

examples were more than a misunderstanding of a single question, but involved longer exchanges encompassing repeated failures to misunderstand despite the FBI agents attempting to clarify or rephrase their questions and statements. *See Mtn. to Suppress*, ECF no. 44, at 11-12. Finally, these seven examples are only those which "appear[ed] on the face of the interrogation transcript." *See Mtn. to Suppress*, ECF no. 44, at 27. Mr. Wu never asserted, and does not assert, that these examples represent the only points of misunderstanding throughout the interrogation.

III. **After conferring with counsel, Mr. Wu declined the use of an interpreter at his initial appearance due to malfunctioning audio equipment. Mr. Wu's participation in this very short hearing was minimal and thus sheds little to no light on his English language capabilities.**

The Government suggests that it is "abundantly clear that [Mr. Wu] understands English" where he declined the use of an interpreter at his Initial Appearance. *Gov't Opp.*, ECF no. 50, at 13. Yet their conclusion does not flow from its premise and is certainly far from "clear." Further, the Government misrepresented Defense counsel's statements regarding the interpreter. Defense counsel did not state that the interpreter was unnecessary or that she was "causing 'trouble' for [Mr. Wu's] ability to understand and was 'not assisting him." *Id.* Instead, defense counsel, Attorney Cara McNamara, stated: "I think that my client is comfortable proceeding in English. There may be a few words that he doesn't understand which is why we wanted to have the assistance of the interpreter, but he's having trouble. I think it's not assisting him right now." *Id.* at 4-5. *Affidavit of Cara McNamara,* attached as Exhibit 2, at 1.

7

The proceedings, which span a mere nine and half pages of transcript, began with an interpreter. *See Initial Appearance Transcript,* Exhibit 1 to Gov't Opp., ECF no. 50, at 3. After a short time during which there appeared to be issues with the interpretation audio equipment, Attorney McNamara conferred with Mr. Wu and then made the above statement on the record.

Attorney McNamara recalls that, while Mr. Wu "spoke some English," "he did not comprehend everything that was being said to him on the first try" such that Attorney McNamara "had to explain things to him several times to make sure he understood [her]." *Exhibit 2*, at 1. However, Mr. Wu's ability to make use of the provided interpreter was impeded by malfunctioning audio equipment, not because Mr. Wu was able to fully understand the proceedings without an interpreter. *Id*. Because of the time pressure, the brevity of the initial appearance hearing, and Attorney McNamara's intention to take time to explain everything to Mr. Wu after the hearing, Attorney McNamara suggested on the record to forego the interpreter. *Id*. at 1-2.

The brief proceedings then proceeded in English, with minimal participation from Mr. Wu. *See Initial Appearance Transcript*, Exhibit 1 to Gov't Opp., ECF no. 50, at 5-12. His statements in English were limited to the following:

- Saying, "hello," at the beginning of the proceedings. *Id*. at 3.
- Saying, "Okay," nine times throughout, in response to statements or questions by the Court. *Id*. at 5-9.
- Saying, "Yeah, I understand," once, in response to a question from the Court. *Id*. at 5.

8

- Saying, "yes," twice in response to statements or questions by the Court." *Id.* at 4, 6.

Given the brevity of the proceeding, Mr. Wu's minimal participation, and the reason for declining the interpreter – i.e., malfunctioning audio equipment that impeded his ability to hear what the interpreter was saying – little about Mr. Wu's English proficiency can be gleaned from the transcript of his initial appearance.

IV. **The cases cited by the Government are inapposite where the defendants in those cases had significantly greater immersion in the English language and United States culture, or where there was little to no evidence of limitations on a defendant's English language proficiency.**

As an initial matter, the Government incorrectly suggests that the *Miranda* waiver form was "neither confusing nor ambiguous" when used in this case, where a judge in this Court has already concluded that, because the form has a single signature line following two distinct sentences concerning understanding of rights and waiver of rights, "there is *no* obvious and unambiguous way of using the form to indicate that a suspect read or was given *Miranda* warnings, understands them, and is exercising, rather than waiving, their rights." *United States v. Clark*, no. 3:22-30012-MGM, 2023 WL 4706521, at *4 (D. Mass. July 21, 2023) (emphasis added). The ambiguity is not contextual; it is inherent in the form itself. Further, although the defendant in *Clark* did not mark the form, she responded, "yes," when read the consent language on the form. *Id.* Moreover, the form was arguably *less* likely to cause confusion for Clark than for Mr. Wu, where there was no evidence to suggest that Ms. Clark's primary language was anything other than English, presumably the language in which her rights were read to her, or that she had

9

grown up outside the United States or spent little time here such that she would have a limited familiarity with such rights in the first instance. *See id.* at 1-3.

The Government's relance on *United States v. Luciano*, 329 F.3d 1 (1st Cir. 2003) is similarly inapt. It is true that, in that case, the defendant signed a consent form. *Id.* at 8. That form differed significantly from the form at issue here. *Id.* at 3. The form used in *Luciano* contained only 3 paragraphs, as follows:

> 1. I have been asked to permit special agents of the Drug Enforcement Administration to search . . . 31 Grape Street, Apt. # 3 (3rd floor), Providence, RI;
> 2. I have not been threatened nor forced in any way;
> 3. I freely consent to this search.

*Id.* at 3. It is thus much simpler and shorter than the *Miranda* waiver form used in the instant case. *Id.* at 8 ("the form was in simple English"). Critically, it does not provide a single signature line for a defendant to answer two distinct questions related to understanding and waiver of any rights discussed therein where the form does not appear to ask for acknowledgement of two distinct facts or understandings. *Id.* Thus, the form in *Luciano*, unlike form FD-395 used here, did not suffer from any ambiguity which rendered any signature on it ambiguous as to exactly what was being acknowledged. Also unlike here, there was also evidence in *Luciano* that, in addition to having been read the form, the defendant "had read it himself[.]" *Id.* at 8.

The defendant in *Luciano* had also spent significantly more time in the United States than has Mr. Wu, and had spent significantly more time in our education system. *Id.* at 7-8 ("twelve of his thirty years – including third through

10

eighth grades – in the United States[.]"). *Id*. at 7. At the time of his interrogation, Mr. Wu had been in the United States for little more than one year. *See Wu Affidavit*, Exhibit 3 to Mtn. to Suppress, ECF no. 44. The defendant in *Luciano* also indicated during his interrogation that he understood English, a factor absent from Mr. Wu's case. *See Luciano*, 329 F.3d at 7-8. In *Luciano,* the defendant also corrected the court interpreter as he translated during the suppression hearing. *Id*. at 8. There is no evidence to suggest that Mr. Wu behaved similarly at his initial appearance, discussed more fully above in Part III. Additionally, in *Luciano*, the defendant provided inconsistent statements about how long he had spent in the United States, and his "testimony was peppered with implausibilities and suspicious lapses in memory." *Id*. at 8. Neither factor is present here.

Likewise, in *United States v. Avila*, 2019 WL 4034820 (D. Mass. Aug. 27, 2019), the defendant had spent significantly greater time in the United States than Mr. Wu, having "worked in the United States for the past 20 years, including at a company where he routinely communicate[d]." *Id*. at *4. This is far more time to become familiar with English and with United States customs and procedures than Mr. Wu had. In *Avila*, the defendant also "testified competently in English at the suppression hearing." *Id*. Presumably this testimony encompassed more than the primarily one-word answers Mr. Wu provided at his initial appearance.

In *Campaneria v. Reid*, 891 F.2d 1014 (2d Cir. 1989), very little information was provided about the defendant's English language proficiency. *Id*. at 1016-1020. There was no expert testimony. *Id*. The defendant does not appear to have been

11

evaluated for English language proficiency. *Id.* There is no indication of the phrasing or format of the *Miranda* warnings provided. *Id.* The version of the *Miranda* warnings provided to Mr. Wu was revised on February 28, 1997, approximately 8 years following *Campaneria. See FD-395, Advice of Rights Form*, Exhibit 8 to Mtn. to Suppress, ECF no. 44. There was testimony that the defendant in that case had immigrated to the United States three years prior. *Id.* Thus, he had spent nearly three times longer in the United States than Mr. Wu had at the time of events relevant to this motion. There was no evidence, unlike here, of any misunderstandings by the defendant prior to, during, or following the provision of *Miranda* warnings. *Id.* The stark record before the court regarding the defendant's English language proficiency in *Campaneria* little resembles that in the instant case.

In *United States v. Checo*, 21-cr-10195-IT, ECF no. 91, at *28-29 (D. Mass. Apr. 26, 2023), the record was likewise remarkably thinner than the record here. In *Checo*, the only evidence of the defendant's lack of English proficiency was that she communicated "exclusively in Spanish during the July 1, 2019 money drop-off" and communications "found in her cellphone on July 17, 2019" were also exclusively in Spanish, and a police officer provided a reading test to her.[3] *Id.* at *28. The court acknowledged that "[i]t is unquestioned that language difficulty can, in some cases,

---

[3] There was no evidence of any misunderstandings by the defendant when communicating in English. *Id.* The court discounted tests of the defendant's English language ability which were conducted by a forensic psychologist. *Id.* at *26-27. It is unclear what training, if any, the proffered expert had in linguistics or language acquisition. *Id.* Here, as discussed in Mr. Wu's motion to suppress, Dr. Chang possesses extensive linguistics and language acquisition expertise. *See Chang Report*, Exhibit 7 to Mtn. to Suppress, ECF no. 44, at 1. The reliability of Dr. Chang's expert opinion is discussed in greater detail in that motion, as well as above in Parts I-II.

12

render a waiver invalid." *Id*. (quoting *United States v. Hristov*, 2010 WL 4449603, at *3 (D. Mass. Nov. 4, 2010). However, the record before it, encompassing only the two above factors, was insufficient to make such a conclusion.

Similarly, in *United States v. Vongkaysone*, 2004 WL 2011447, at *13-14 (D. Me. Sept. 9, 2004), the record of limitations on the defendants' English proficiency was sparse. "The *only* evidence adduced at hearing regarding the *Miranda* waivers of either Phonthep or Hansana was that both men appeared to comprehend English and to understand their *Miranda* rights, which Buchanan read to each defendant slowly and clearly in English verbatim from a pre-printed DEA form, pausing to inquire after each right whether each defendant had understood it and receiving an affirmative response." *Id*. at *13 (emphasis added). Critically, unlike here, "there was *no* [proof] that [the defendant] (i) does in fact suffer from English-language difficulties, (ii) gave any indication that he needed a translator, or (iii) otherwise signaled that he was having difficulty understanding his rights on the night in question." *Id*. (emphasis added). This stands in stark contrast to the instant case, where Mr. Wu has presented substantial evidence that his English language ability suffers from significant limitations and the record of the FBI interrogation, peppered throughout with misunderstandings both before and after the *Miranda* warnings were recited to him, signaled that Mr. Wu *was* having difficulty understanding what was being said to him.

The evidence in *United States v. De Yian*, 1995 WL 422019 (S.D.N.Y. July 18, 1995), was likewise dissimilar. Unlike here, the defendant in that case did not

13

indicate at any point in his interview with law enforcement that he did not understand or was confused by what was being said. *Id.* at *2.

*Perri v. Director*, 817 F.2d 448 (7th Cir. 1987) also differs from the instant case in several critical respects. In that case, the record evidence was that the defendant was given each *Miranda* warning first in English and then in Italian, at which point the defendant responded in Italian to the translation of each warning, followed by the assistant state's attorney asking in English whether the defendant understood, to which the defendant responded in English that he did. *Id.* at 449. Nothing close to this bilingual administration of rights occurred here. Moreover, the defendant in *Perri*, had resided in the United States for at least three years prior to his arrest, followed by a brief return to Italy, before returning again to the United States before the events giving rise to that case. *Id.* at 449.

**V.    Mr. Wu's statements in Brighton District Court must be suppressed where they were involuntary. The invocation or lack thereof of the Fifth Amendment privilege against self-incrimination is not dispositive.**

Finally, the Government appears to misunderstand Mr. Wu's argument as to why his statements in the Brighton Court should be suppressed. Mr. Wu does not contend that his statements are inadmissible because of any Fifth Amendment privilege. Instead, he asserts that his statements are inadmissible because, based on the totality of the circumstances, his statements were involuntary.

*Salinas v. Texas*, 570 U.S. 178, 184-185 (2013), supports Mr. Wu's assertion that involuntariness is the appropriate framework to analyze the admissibility of his statements before the Brighton Court. While "governmental coercion" is the

14

primary concern related to the Fifth Amendment, *Colorado v. Connelly*, 479 U.S. 515, 523 (1986), the totality of the circumstances, including a defendant's cultural background and whether a defendant had a limited English proficiency, must be considered in determining whether any governmental coercion overbore an individual defendant's will, *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *United States v. Garibay*, 143 F.3d 534, 537-538 (9th Cir. 1998).

Further, counsel has found no case which has definitively stated that court testimony is always voluntary. To the contrary, the fact-specific analysis of such claims by courts across the country belies a conclusion that such a claim may be summarily dismissed. *Cf.*, *e.g.*, *United States v. Garnes*, 258 F.2d 530, 534 (2d Cir. 1958) (testimony not involuntary where defendant was "helping the Government all she could and [] testified voluntarily, and where defendant "was advised of her privilege against self-incrimination, and offered an opportunity to employ and consult with counsel").

## CONCLUSION

For the reasons explained above, and in Mr. Wu's motion to suppress, his motion to suppress should be allowed.

Respectfully Submitted,
**Xiaolei Wu**
By his attorneys,

/s/ Jessica Hedges
Jessica D. Hedges
BBO No. 645847
Hedges & Tumposky, LLP
88 Broad St., Suite 101
Boston, MA 02110
617-722-8220

/s/ Michael Tumposky
Michael Tumposky
BBO No. 660618
Hedges & Tumposky, LLP
88 Broad St., Suite 101
Boston, MA 02110
(617) 722-8220

/s/ Hannah Taylor
Hannah Taylor
BBO No. 710056
Hedges & Tumposky, LLP
88 Broad St., Suite 101
Boston, MA 02110
(617) 722-8220

# CERTIFICATE OF SERVICE

I, Jessica Hedges, hereby certify that, on December 18, 2023, I served a true copy of the above document on all counsel of record through the electronic case filing system.

/s/ Jessica Hedges
Jessica Hedges