UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) ) |
| v. | ) ) )  Criminal No. 23-cr-10005-DJC |
| XIAOLEI WU, | ) ) ) ) |
| Defendant. | ) ) ) |

<u>MEMORANDUM AND ORDER</u>

CASPER, J.                                                          January 16, 2024

## I.     Introduction

Defendant Xiaolei Wu ("Wu") has moved to suppress his statements during a custodial interrogation by agents of the Federal Bureau of Investigation ("FBI") on December 14, 2022 and all evidence obtained from the use of those statements on the grounds that he did not voluntarily, knowingly and intelligently waive his <u>Miranda</u> rights and did not voluntarily answered the agents' questions.  D. 44.  He also moves to suppress his statements during a civil TRO hearing in the Brighton District Court on November 18, 2022 on the grounds that those statements were obtained in violation of the Fifth Amendment or otherwise were involuntary.  D. 44 at 1; D. 52 at 14.  Having considered Wu's motion, D. 44, the government's opposition, D. 50, Wu's reply, D. 52, and the evidence (including testimony and Exhibits 1-9A) presented at the evidentiary hearing held on December 20, 2023, D. 53, and January 10, 2024, D. 65, counsel's argument at same and the parties' stipulation, D. 63, the Court DENIES the motion.  In support of this rulings, the Court makes its findings of fact and legal analysis below.

1

II.    **Findings of Fact**

These findings are based upon the testimony of the witnesses and Exhibits 1-9A admitted at the motion hearing, and the parties' stipulation, D. 63.

A.    <u>**Allegations Leading to the Charges Against Wu**</u>

On or around October 22, 2022, an individual (referred to herein as "Miss Zooey") posted a flyer on a window at or around Berklee College of Music, where both Miss Zooey and Wu were students at the time, which read:

> WE WANT FREEDOM
> WE WANT FOOD ON OUR TABLES
> WE WANT TO BREATHE
> WE WANT ART
> WE WANT DEMOCRACY
> WE WANT TO LOVE
> STAND WITH CHINESE PEOPLE

D. 2-1 ¶ 11.  Miss Zooey also posted a photo of the poster to her Instagram account.  <u>Id.</u> Wu, who was a follower of her Instagram account, had access to this post.  <u>Id.</u>  As alleged, Wu then responded  to the poster with threatening and harassing communications on social media and by email directed at Miss Zooey.  On the evening of October 22nd, Wu allegedly posted in a Berklee Class of 2024 WeChat group (which had 300 members including Miss Zooey), saying, among other things, in Mandarin:

> @ [Miss Zooey] don't you fucking post reactionary posters
> Fucking tear [tore] all of them you bastard
> You go to post them at Tian'anmen Square
> Post more, I will chop your bastard hands(s) off

<u>Id.</u> ¶ 12.  A few hours later, in the wee hours of October 23, 2022, Wu posted again to the same group chat, noting that "I already called the tipoff line in the country, the public security agency will go greet your family."  <u>Id.</u> ¶ 13.  The government alleges that Wu intended this as a further threat against Miss Zooey as he was indicating that he had informed public security in the People's

Republic of China ("PRC") about her poster and that this security force would investigate the loyalty of her family members who live there.  Id.  Later, Wu posted again indicating that he was trying to determine where Miss Zooey currently resided.  Id. ¶ 15.  The following day, October 24, 2023,  Wu emailed Miss Zooey through his Berklee school account (and also posted a screenshot of his message to his Instagram account).  Id. ¶ 16.  This email also allegedly included threatening language, reiterating that he called the tipoff line in PRC, that Miss Zooey should be fearful of returning there since she was likely to get arrested and that her family there would be subject to "political review."  Id.  Wu also noted that his threats and harassment (and reporting to the PRC tipoff line) would continue:  "you will not be able to get rid of me."  Id.  On the same day, Wu posted Miss Zooey's email in the Berklee Class of 2024 WeChat group chat, saying "let's all do it together," encouraging others to join him in his harassment of her.  Id. ¶ 18.

**B.**      **TRO Proceeding in Brighton District Court on November 18, 2022**

Miss Zooey soon thereafter sought a temporary restraining order ("TRO") against Wu for this course of conduct.  On November 18, 2022, both Wu and Miss Zooey appeared for the TRO hearing in the Brighton District Court.  Exh. 5, 5A.  Both Wu and Miss Zooey proceeded *pro se* and were sworn in and answered questions from the Court (Donnelly, J.).  Exh. 5, 5A.  This proceeding (which lasted less than twenty minutes) was conducted in English and there is no suggestion that a Mandarin interpreter was offered by the court to, or requested by, Wu.  Id.  In response to questioning from the court, Wu admitted, among other things, that he had threatened that he was going to chop Miss Zooey's hands off and that he knew it was a threat, but he was not intending to carry it out.  Exh. 5A at 9.  After warning Wu not to have any further contact with Miss Zooey and of the consequences of making threats (which might lead to criminal prosecution), the court decided not to extend the TRO and advised Miss Zooey to come back to Court if Wu posted anything else or his family or friends reached out to her again.  Id. at 12, 15-16.

### C.      <u>Arrest and Statements to the FBI on December 14, 2022</u>

Several weeks later, on December 14, 2022, Wu was arrested on federal cyberstalking charges in violation of 18 U.S.C. § 2261A, D. 2, by the FBI.  Exhs. 1, 1A, 4.  The FBI transported Wu to the FBI Field Office in Chelsea, Massachusetts.  Exh. 1A.  There, he was interviewed by FBI Special Agent Kirk ("SA Kirk") and Special Agent Allen ("SA Allen").  This interview was audio and video recorded.  Exhs. 1, 4.  Although Wu was handcuffed upon arrest, he was not handcuffed during the interview.  The interview was conducted in English and there was not a Chinese interpreter offered by the FBI or requested by Wu.  Prior to questioning, SA Kirk gave Wu a <u>Miranda</u> form in simplified Chinese and read him his <u>Miranda</u> rights from an English language form. Exh. 1A at 3-5; Exhs. 2, 3.  After the reading of each of the rights, Wu indicated he understood and then signed the English language form. Exh. 2.  The interview, that lasted approximately fifty minutes, then proceeded and was conducted in English.  Exh. 1, 1A, 4. At some point during the interview, SA Kirk asked Wu for the passcode to his cellphone and Wu provided it to the agents.  Exh. 1A at 33.

### D.      <u>Wu's Initial Appearance in U.S. District Court</u>

Later on December 14, 2022, Wu made his initial appearance in this Court (Kelley, M.J.). Exh. 6; D. 63.  Initially, Wu was provided a Mandarin interpreter.  D. 6 at 3-5.  Shortly into the appearance, Wu's counsel indicated that "he's having trouble," <u>id.</u> at 5, which was a reference to the fact that the interpretation was not assisting him, since "the malfunctioning audio equipment . . . made it difficult for Mr. Wu to hear what the interpreter was saying."  D. 63 ¶ 5.  The Court then asked Wu directly if it was okay to proceed without the interpreter, to which Wu, replied in English, "okay."  D. 6 at 5. Wu indicated that he understand the rights and warnings the Court gave him throughout the remainder of the brief proceeding.  D. 6 at 5-12.

4

### III.     Procedural History

On January 10, 2023, Wu was indicted on charges of cyberstalking in violation of 18 U.S.C. § 2261A (Count I) and interstate transmission of a threatening communication in violation of 18 U.S.C. § 875 (Count II).  On November 28, 2023, Wu filed the present motion to suppress, D. 44, and the Court conducted an evidentiary hearing regarding same on December 20, 2023, D. 53, and January 10, 2024, D. 65.

### IV.     Discussion

#### A.     The FBI Agents Obtained a Voluntary, Knowing and Intelligent Waiver of Wu's Miranda Rights

Wu contends that the FBI agents did not obtain a voluntary, knowing and intelligent waiver of his Miranda rights at the December 14, 2022 interview.  It is well settled that prior to a custodial interrogation, police must inform a person accused of criminal conduct of his Miranda rights. Miranda v. Arizona, 384 U.S. 436, 479 (1966);  United States v. Molina-Gomez, 781 F.3d 13, 21 (1st Cir. 2015); United States v. Guerrier, 669 F.3d 1, 5 (1ˢᵗ Cir. 2011); United States v. Gonzalez, 719 F. Supp. 2d 167, 170-71 (D. Mass. 2010).  A defendant may voluntarily, knowingly and intelligently waive any of these rights, Gonzalez, 719 F. Supp. At 170, but the burden is on the government to prove, by a preponderance of the evidence, that he did so.  Berghius v. Thompkins, 560 U.S. 370, 384 (2010); United States v. Andrews, 847 F. Supp. 2d 236, 246 (D. Mass. 2012). "An express written or oral statement or waiver by a defendant of his right to remain silent or of the right to legal assistance of counsel, though not conclusive, is 'usually strong proof of validity of that waiver.'"  United States v. Hack, 782 F.2d 862, 866 (10th Cir. 1986) (quoting North Carolina v. Butler, 441 U.S. 369, 373 (1979)); see United States v. Ramos, 591 F. Supp. 2d 93, 114-15 (D. Mass. 2008).

A Miranda waiver is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception."  Moran v. Burbine, 475 U.S. 412, 421 (1986); United States v. Bezanson-Perkins, 390 F.3d 34, 39 (1st Cir. 2004).  That is, for a waiver to be voluntary, the Court mut look at the totality of circumstances "including any promises or threats made by police officers or the prosecution, in order to see whether the will of the accused was overborne." United States v. Jackson, 918 F.2d 236, 242 (1st Cir. 1990) (rejecting defendant's argument that his statement to police was coerced where no direct threats or promises were made and, even assuming that police suggested that his sister might be spared if he admitted ownership of the firearm, the totality of circumstances did not indicate that his will was overborne); United States v. Hughes, 640 F.3d 428, 438 (1st Cir. 2011) (rejecting a similar claim where, among other things, the conditions of the interview "were not ominous," "no inducements were offered and no threats were voiced" and when defendant suffered a panic attack, the officers took steps to mitigate his symptoms).  "While difficulty understanding English can be a factor in determining the voluntariness of an admission, courts consider the defendant's English comprehension as part of the totality of the circumstances." United States v. Avila, No. 18-cr-10343-IT, 2019 WL 4034820, at *4 (D. Mass. Aug. 27, 2019) (citing United Sates v. Mahmood, 415 F. Supp. 2d 13, 19 (D. Mass. 2006)).

"A waiver is knowing and intelligent when 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Bezanson-Perkins, 390 F.3d at 39 (quoting Moran, 475 U.S. at 421).  As with the determination of the voluntariness of the waiver, to assess whether a Miranda waiver was also knowingly and intelligently made, the Court must consider the totality of the circumstances of the custodial

interrogation, id., "including the background, experience, and conduct of the accused." Butler, 441 U.S. at 374-75.

As initial matter, the December 14, 2022 interview was a custodial interrogation. The government does not contest this fact (and there would be no basis to do so) as Wu had just been arrested and escorted to the FBI Field Office before being transported to Court for his initial appearance on federal criminal charges. It is also not disputed that Wu was Mirandized as the audio and video recording (and transcript), D. 1, 1A, 4, reflect that SA Kirk gave Wu his Miranda rights before beginning any questioning. Accordingly, the Court moves to the disputed issue of whether Wu voluntarily, knowingly and intelligently waived his Miranda waiver.

> 1. *None of Wu's Challenges, Alone or Cumulatively, Show that his Miranda Waiver was Not Voluntarily, Knowingly and Intelligently Made*

Based upon the totality of circumstances, the Court concludes that Wu voluntarily waived his Miranda rights during the custodial interview. Although the interview came after his arrest that morning, Wu was not handcuffed during the interview and the tone of the agents throughout the interview was non-confrontational. As the video and transcript reveal as well, no promises, threats or inducements were made. The interview was conducted by two agents, SA Kirk taking the lead, and the duration of the interview (approximately fifty minutes) was not unreasonable. Although the Court will address Wu's background, experience and conduct further below (and that analysis applies with equal measure to this voluntariness analysis), the Court concludes that "although English may not be [Wu's] first language, his English skills were not so diminished as to undermine the voluntariness of his statements, particularly in consideration with the other circumstances of the interview." Avila, 2019 WL 4034820, at *4.

As to whether he waived his Miranda rights voluntarily, knowingly and intelligently, Wu contends that he did not so specifically because: 1) SA Kirk's explanation of his rights at the

beginning of the interview was confusing; 2) Wu has limited English proficiency; and 3) he has limited understanding of the U.S. criminal legal system.  D. 44 at 15.  The Court will address each of these grounds below.

> a.  *Considering SA Kirk's Initial Responses to Wu*

As to the first ground, Wu contends that SA Kirk's initial statement at the beginning of the interview was, at a minimum, confusing.  The Court disagrees.  At the beginning of the December 14th session, SA Kirk explains that Wu was going to appear before a judge later in the day who would explain the charges, but that the agents could also explain them as well, "[b]ut before we do any of that," that he needed to advise him of "the rights that you have as somebody in the United States."  Exh. 1A at 2.  Before the agent could begin to advise him of his Miranda rights, however, Wu interrupts to ask about the later appearance before the judge.  Id.  at 3.  When SA Allen explains that the appearance will be before a "federal judge," Wu responds "I don't have lawyer?"  Id.  SA Kirk then responds to this interjection to explain, correctly, "if you cannot afford a lawyer, one could be provided for you down the line" and that "all that's going to be explained when you see the Judge."  Id.  SA Kirk then returns to beginning to advise Wu of his Miranda rights, prefacing that the agents are sitting down with him to see "if [he] want[s] to give [his] side of the story regarding why [the agents] arrested [him]."  Id.

SA Kirk continues that "[b]ut before I can explain any of that, we have to read you this form right here."  Id.  SA Kirk explains that he is going to read the Miranda rights in English, but also hands Wu a simplified Chinese version of the same form.  Id.; Exh. 3. SA Kirk then explains that he is going to read each of those rights and will ask Wu "to say that you understand what was read to you" and that at the end of that exchange, Wu "can say whether or not you want to talk or you want a lawyer."  Id.  Wu responds affirmatively to the agent asking whether that makes sense

and responds affirmatively to understanding each of the <u>Miranda</u> warnings that the agent then reads him.  <u>Id.</u> at 3-5.  In response to whether he would like to answer questions, Wu responds that "I'll just sign," and signs the English version form.  <u>Id.</u> at 5.

In the context of the agents' exchange with Wu, the Court does not conclude that SA Kirk's initial response to Wu was confusing.  <u>Cf.</u> <u>United States v. Beale</u>, 921 F.2d 1412, 1434-35 (11th Cir. 1991) (concluding that agents' instruction that signing the <u>Miranda</u> waiver form would not hurt him "agents contradicted the Miranda warning that a defendant's statements can be used against the defendant in court, thereby misleading [the defendant] concerning the consequences of relinquishing his right to remain silent").  He had begun the interview appropriately with turning to the <u>Miranda</u> form, but when Wu jumped into ask a question about appearing before a judge and then immediately thereafter about asking about a lawyer, SA Kirk responded that an attorney would be appointed for him for that court proceeding.  He then returned to <u>Miranda</u> warnings, including but not limited to, that Wu had a right to talk to lawyer before any questioning, the right to have a lawyer present, and the right to have an attorney appointed before any questioning, and that even if he decided to answer any questions without attorney, he could stop the questioning at any time.  Exh. 1A at 4; <u>cf.</u> <u>United States v. Clark</u>, No. 3:22-cr-300120-MGM, 2023 WL 4706521, at *5 (D. Mass. July 21, 2023) (suppressing defendant's statements where, after acknowledging that she understood her <u>Miranda</u> rights, she asked if she could call her attorney).[1]  Given these circumstances, SA Kirk's response at the beginning of the interview are not a basis, either by itself

---

[1] Also, the circumstances for defendant in <u>Clark</u> were different from those for Wu here.  There, the defendant remained handcuffed through the entire <u>Miranda</u> process, there was no recording of the interaction and although the agent read the written <u>Miranda</u> form and the defendant gave a verbal response, she was not given or "allowed to actually write on the form."  <u>Clark</u>, 2023 WL 4706521, at *1, 4.

or in conjunction with the other grounds, to suggest that Wu's Miranda waiver was not knowingly, voluntarily and intelligently made.

### b. Considering Wu's English proficiency

As the second ground for his challenge to his Miranda waiver, Wu points to his limited proficiency in English where the SA Kirk explained the Miranda warnings orally in English.  The Court has considered that Wu was born in and grew up in Beijing, and his primary language is Mandarin.  Wu had never lived here until he moved to Boston in August 2021 to attend Berklee College of Music, where his classes are taught in English.  At the time of the FBI interview, he had been living in the U.S. for approximately sixteen months.  Before arriving here, his studies in Beijing had included numerous courses regarding English including several levels of "English Listening," "English Grammar," "Oral English," "English Reading," "Comprehensive English." Exh. 7.  In his school years there, he also completed courses in "English Speech and Debate," "Advanced English," "American Literature," and "English Literature."  Id.

The Court has also considered the testimony and expert report of Dr. Charles B. Chang ("Dr. Chang").  Exh. 9, 9A.  Dr. Chang is an expert in the fields of linguistics and applied linguistics and performed an English proficiency evaluation of Wu based on an Oral Proficiency Interview ("OPI") procedure of the American Council on the Teaching of Foreign Languages ("ACTFL") on October 25, 2023, approximately ten months after the FBI interview in this case. Exh. 9 at 1.  This interview took approximately twenty-five minutes and based upon the OPI protocol, an evaluator rates the test-taker on a four-level scale from Novice to Superior.  Exh. 9 at 2.  Based upon this evaluation (and his review of the transcript of the November 18, 2022 Brighton District Court hearing and an oral recording of the December 14, 2022 FBI interview, Exh. 9, 9A), Dr. Chang concluded that Wu was at the Intermediate (Level 2), meaning that he could "do more

than communicate minimally with formulaic and rote expressions" and could "initiate, maintain, and close simple conversations." Exh. 9 at 3. He concluded that Wu also "can construct full sentences, albeit not a lot of connected discourse or oral paragraphs; and he can be understood with some repetition by a sympathetic listener." Id. Dr. Chang observed that "although Wu is able to generate quite a lot of spontaneous spoken English, there are significant limitations in his English ability." Id. He also observed that Wu "does not necessarily recognize or act when he has failed to understand something, and he may let the conversation proceed in the hopes that he will pick up things he missed later on in the conversation." Id. Dr. Chang concluded, based upon the "specific examples of misunderstandings observed during the OPI and the examples of misunderstandings that appear in the [Brighton District Court] hearing transcript and the [FBI] interview recording," that "there is a reasonably high chance that [Wu] did not fully understand the Miranda warning during the FBI interview and did not fully understand all of the questions asked of him and statements made to him by the judge in state court or by the agents during the FBI interview." Id. at 5.

Although the Court credits Dr. Chang's expertise and has considered his observations opinion about Wu's oral English proficiency, the Court does not conclude that his level of English proficiency rendered his Miranda waiver not voluntarily, knowingly and intelligently made for a number of reasons. First, even as Dr. Chang opined that Wu's proficiency was above the lowest, Novice level and has not reached the highest, Superior level, his communication in English is more than minimal and he can initiate, maintain and close simple conversations, can construct full sentences and be understood with some repetition. This was more than evident in both the full recordings and transcripts of both the November 18, 2022 Brighton District Court hearing and the FBI custodial interrogation. Second, the Miranda rights were communicated in simple sentences,

11

see United States v. Luciano, 329 F.3d 1, 8 (1st Cir. 2003) (noting that consent-to-search form "was in simple English" in a case rejecting defendant's challenge that he had not voluntarily and knowingly consented to the search), and Wu responded affirmatively to each.  To Dr. Chang's observation that Wu did not always ask questions when he did not understand, there is no suggestion as to that exchange that he did not understand, particularly when Wu had not hesitated to interrupt moments before with a question about the proceeding before the judge.  Compare Exh. 1A at 2 with Exh. 1A at 3-5.  Third, and significantly, the Miranda rights form in Chinese was provided to Wu before SA Kirk recited them in English and Wu continued to hold that form while SA Kirk gave him the same warnings in English.  Exh. 1; Exh. 1A at 3; Exh. 3.  On the video, it appears that Wu reads the one-page Chinese form from the counter at 8:50:03-8:50:39 before SA Kirk even recites each of the Miranda rights in English and asks Wu if he understands them.  Exh. 1.  Like the English form, the Chinese form is a single page reciting each of the rights.  Exhs. 2, 3. As the video reveals, Wu continues to have the Chinese form in hand and appears to glance at it as he then listened and responded to the oral recitation of same in English.

Fourth, this Court must consider all of the evidence before it in assessing the motion to suppress, including the video of that interview and information of Wu's prior studies, which were not available to Dr. Chang at the time that he rendered his opinion in this case.  Although the Court has considered Dr. Chang's observation that the fact Wu took classes in Beijing in English does not necessarily reveal the value of same, it does provide some background.  Over five years of instruction, Wu took increasing levels of courses in English including but not limited to oral English and English listening and even English Speech and Debate.  Exh. 7.  Presumably such coursework contributed to his English proficiency and his ability to apply and be accepted to an American college program.  Even as Mandarin may remain Wu's preferred language (i.e., the

language he resorted to in his WeChat posts, for one example), the totality of the record does not support that his "English comprehension [was] inadequate." Unites States v. Checo, No. 21-cr-10195-IT, D. 91 at 28 (D. Mass. Apr. 26, 2023) (denying motion to suppress where defendant had contended that his English was inadequate for a voluntary, knowing and intelligent waiver of her Miranda rights).

Fifth, the areas of "clear misunderstandings" that Dr. Chang cites in his report, Exh. 9 at 4, do not appear to the Court necessarily to bear on his lack of sufficient English proficiency. When SA Allen asked Wu, "what would happen to her family" if he had actually reported her to PRC public security, Wu's answer that "I don't know. I don't see them family. I never, like, report her what she did—," Exh 1A at 10, does not necessarily represent a misunderstanding of the question, but instead could represent a desire to reiterate to the agents that he had not actually made such a report. Moreover, when SA Kirk reframes the question, Wu immediately responds that they would get in trouble for such activity in the PRC. Id. A later exchange that Dr. Chang cites when SA Kirk asks "how did you figure out you had the wrong address [for Miss Zooey] then?," appears to be an instance when Wu asks a clarifying question (WU: The wrong address right now?) which leads SA Kirk to rephrase the question, Wu to answer it and the conversation to continue. Exh. 1A at 15. Lastly, the exchange that begins with SA Kirk asking Wu about what he was planning to do with the student records if he got them, Wu responded "What?" and then, both SA Kirk and SA Allen jump in to clarify what they are asking. Exh. 1A at 16. Wu's response that "I don't know. I didn't do that," again, does not necessarily indicate continued misunderstanding of the initial question, but an attempt to stress that he did not try to get Miss Zooey's student records. Id. Such interpretation is consistent with the exchange that immediately follows: SA ALLEN: But you were asking for them. WU: No, I'm not asking for them. I never – I never asking anyone to

get her student record).  Id.   To the extent that defense counsel points to other alleged misunderstandings by Wu during the course of FBI interview, D. 44 at 12-13, none of them suggest individually or cumulatively, that Wu did not have sufficient proficiency to waive his Miranda rights.  Although perhaps initially misunderstanding or mishearing SA Kirk's question about the form of his final musical examination, the two continue in a discussion on this topic in which Wu explains that matter in some detail.  Exh. 1A at 25.  The Court disagrees that Wu's responses to SA Kirk's attempt to explain automatic discovery in criminal cases indicates a misunderstanding on his part.  Id. at 30-31.  Lastly, that Wu misunderstands the term of art, "appearance" (in Court), as a reference to "parents," is immediately clarified by the agents when Wu communicates his confusion.  Id. at 44.

The caselaw cited by Wu also does not warrant a different conclusion here.  Wu primarily relies on United States v. Garibay, 143 F.3d 534 (9th Cir. 1998).  There, the court concluded that a defendant with limited English proficiency and a low verbal IQ had not voluntarily, knowingly and intelligently waived his Miranda rights.  Id. at 537.  The record in that case showed that the defendant understood "only a few things in English" and although he attended a U.S. high school, he had received failing grades in his English classes and all witnesses, except the interrogating agent, testified about communicating with him in Spanish.  Id. at 538.  In addition, it was undisputed that the defendant had a very low IQ.  Id.  The facts here are very different.  There is no suggestion of a low IQ and Wu's academic record and achievements suggest the opposite.  Moreover, Wu is proficient in English, even if not at the highest levels.  Unlike Garibay who understood only "a few things in English," Wu was able to take college classes in English, answer the judge's questions in English at the Brighton District Court hearing in November 2022 and participate fully in the interview with the agents on December 14, 2022.  Although some

14

defendants who moved to suppress on similar grounds may have spent more time in the United States, see, e.g., Luciano, 329 F.3d at 8 (rejecting a challenge to consent to search by a defendant who spent twelve of his thirty years in the U.S.); United States v. Abou-Saada, 785 F.2d 1, 10 (1st Cir. 1986) (rejecting defendant's challenge to his Miranda waiver where although he was born abroad and left school at age 16, had lived in the U.S. for sixteen years, was able to answer the agents' questions "perfectly well in English" and, even with an interpreter, "would sometimes answer questions in English before they were translated"), none of them had the record of studying English for a sustained period before arriving or taking college level classes in the United States that Wu did or, like here, in addition to having the rights read in English, also had them in hand in his native language. See Luciano, 329 F.3d at 3 (affirming denial of suppression motion where defendant had been read his Miranda rights read in both English and Spanish, but the challenged consent-to-search form was only in English and only read to him in English). Having considered the entirety of the record and the totality of the circumstances, the Court concludes that Wu had sufficient English proficiency to understand his Miranda rights and voluntarily, knowingly and intelligently waive them. See United States v. Vongkaysone, No. 04-cr-43-P-S, 2004 WL 2011447, at * (D. Me. Sept. 9, 2004) (rejecting defendant's challenge to his Miranda waiver given an alleged language barrier where he (and his co-defendant) where "both men appeared to comprehend English and to understand their Miranda rights").[2]

---

[2]To the extent that Wu points to the Department of Justice's December 2022 announcement of a Language Access Initiative and an Executive Order calling for language access plans for governmental agencies, D. 44 at 13-14, to suggest that the FBI agents here should have secured an interpreter, such conclusion does not follow. Even assuming these initiatives and Order even apply here, there were no circumstances here that would have suggested that Wu needed a Mandarin interpreter or that the absence means that his waiver was not voluntarily, knowingly and intelligently made. As SA Allen testified, the agents knew that Wu was a Chinese national, but also was a student at Berklee (where he took courses in English), he did not request an interpreter, and he was able to converse with them in English for the entirety of the interview.

    *c.  Considering Wu's Knowledge of the U.S. Criminal Justice System*

As to the third ground challenging the validity of his <u>Miranda</u> waiver, Wu points to that because he grew up in China, he has a limited understanding of United States culture and customs and little familiarity with the United States criminal legal system, the concept of <u>Miranda</u> rights and his option to waive those rights.  D. 44 at 18-19.  In support of this argument, Wu offers the expert report and testimony of Dr. Ira Belkin ("Dr. Belkin"), an adjunct professor at NYU School of Law with expertise in the study of the Chinese legal system.  D. 8.  It is not disputed that the Chinese legal system for those charged with crimes is vastly different than the U.S. criminal justice system.  Without repeating all of Dr. Belkin's testimony, there is no comparable <u>Miranda</u> rights in the PRC, specifically no "right to remain silent" or discontinue interrogation, or to have counsel (or access to counsel) during interrogation or any legal requirement that custodial interrogations be free of coercion.  Exh. 8 at 1-2.  Although Dr. Belkin provided this background about the Chinese legal system in criminal cases generally (and its distinctions from the U.S. system), he has no particular knowledge of Wu's familiarity with either system.  Although Wu grew up in China and remains a national of that country, the totality of circumstances here suggest that Wu has some familiarity with the ways in which the U.S. criminal justice system differs.  <u>See, e.g.</u>, <u>United States v. Labrada-Bustamante</u>, 428 F.3d 1252, 1259 (9th Cir. 2005) (concluding that defendant's lack of familiarity "with the United States' form of justice is merely one factor to be considered," and the totality of the circumstances, namely defendant's admission that he understood his rights and the lack of evidence of "police overreaching" or threats or promises, showed that the <u>Miranda</u> waiver was valid).  The beginning of December 14, 2022 custodial interrogation, discussed above, in which Wu interjects to confirm that he will see the judge in the afternoon and then asks about not having a lawyer, Exh. 1A at 2-3, suggests some understanding of the way in which the U.S. criminal justice system proceeds differently than if he had been arrested in his native country.

Lastly, as the government pointed out in its cross examination of Dr. Belkin, at least one purpose of <u>Miranda</u> warnings is to advise anyone, whether long-time U.S. citizen or foreign national, of these rights.  The agents did so here.

For all of these reasons, the Court concludes that the government has sustained its burden of showing, by a preponderance of the evidence, that Wu voluntarily, knowing and intelligently waived his <u>Miranda</u> rights on December 14, 2022.

### B.   <u>Wu's Statements During the FBI Interview were Voluntary</u>

Having concluded that Wu's <u>Miranda</u> waiver was valid, suppression of his subsequent statements to the agents on December 14, 2022 is not warranted on this basis.  Wu argues that such statements may still be suppressed if they were not voluntary statements.  D. 44 at 25; <u>Jackson</u>, 918 F.2d at 241.  For similar reasons to the discussion of the totality of circumstances above, there is no suggestion that Wu's will was overborne or that his statements were coerced.  The tone of the agent's questions remained non-confrontational throughout the questioning, the interrogation was of reasonable length and they made no threats, promises or inducements to Wu.  Moreover, when the agents began their questions after Wu's <u>Miranda</u> waiver, they immediately made the topic of interrogation known to Wu by presenting him with photo of Miss Zooey's posters and then showing him copies of his posts and emails as they questioned him.  Given the totality of circumstances (including those personal to Wu's background discussed at length above) and in the absence of any coercive tactics, the Court concludes that Wu's statements to the agents on December 14, 2022 were voluntarily made and suppression as to same is denied.[3]

---

[3] This ruling includes denial of the motion to suppress the cellphone passcode the agents elicited from Wu and he provided to them.  The government argues, alternatively, that even if the Court suppressed his statements (including the passcode), suppression of the evidence from his cellphone is not necessary given it "would inevitably have been discovered without reference to the police error or misconduct."  <u>Nix v. Williams</u>, 467 U.S. 431, 448 (1984).  D. 50 at 17.  "Such evidence is

For all of these reasons, the Court DENIES Wu's motion to suppress his statements on December 14, 2022 (and the fruits of same).

## C.  Wu's Statements in Brighton District Court Were Not Involuntary

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  The Fifth Amendment also provides this privilege in civil proceedings, "where the answers might incriminate [an individual] in future criminal proceedings."  Lefkowitz v. Turley, 414 U.S. 70, 77 (1973).  The general rule is that "for testimony to be considered 'compelled' within the meaning of the Amendment, 'the privilege must be claimed when self-incrimination is threatened.'"  United States v. Rogers, 988 F.3d 106, 110 (1st Cir. 2021) (internal citation omitted).  "If a person does not invoke [the privilege] and chooses to speak, any resultant testimony" will be considered voluntary.  Id.  There are two exceptions to this invocation rule.  Salinas v. Texas, 570 U.S. 178, 184 (2013).  First, a criminal defendant does not need to take the stand and assert the privilege at his own trial.  Id.  Second, "a witness's failure to invoke the privilege must be excused where governmental coercion makes his forfeiture of the privilege."  Id. (noting that, "[f]or similar reasons, . . . threats to withdraw a governmental benefit such as public employment sometimes make exercise of the privilege so costly that it need not be affirmatively asserted").

---

admissible so long as (i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment."  Hughes, 640 F.3d at 440 (concluding that this "alternative basis for admitted the evidence seized" applied). Here, such alternative basis for declining to suppress the evidence from cellphone applies because, based upon Wu's arrest and the nature of the charges, the agents would have had an independent basis to seek this evidence, its discovery would have been inevitable (particularly given SA Kelsch's testimony about the extraction of data that could be done from Wu's type of cell phone as of December 2022 even without a passcode), and the application here would not undermine the purposes of the exclusionary rule.

Wu argues that the statements he made to the judge during the Brighton District Court Hearing should be suppressed because he did not know that he had a Fifth Amendment right against self-incrimination and thus did not voluntarily waive this right. D. 44 at 30. This argument fails since Wu did not invoke his Fifth Amendment privilege and neither the exceptions to invocation apply here. The Brighton District Court proceeding was not a criminal trial and there was no governmental coercion such that his failure to invoke the privilege is excused.

To the extent that Wu argues, alternatively, that his statements during the state court proceeding should be suppressed because they were not made voluntarily, the Court does not agree on this record. In arguing that his statements there were involuntary, the defense (and Dr. Chang) point to a few instances in which Wu appears to misunderstand the judge's questions. First, was when the judge asked about the poster that Miss Zooey had posted (THE COURT: Posters of what?; WU: The poster; THE COURT: What does the poster say?; WU: We just talk about the Chinese – like Chinese political things, Exh. 5A at 6). This exchange comes on the heels of Wu apparently handing up to the judge a translation of the exchanges with Miss Zooey. Exh. 5A at 4-5. It is not clear that Wu misunderstand the judge, because he then talks about the "quote,"[4] and cites to some of the language on the poster. Wu is speaking in sufficient English that the judge understands as he follows up with: THE COURT: All right, right, so she posted something, and you thought that would get her in trouble if she goes back to China? To which Wu agrees (WU: Yes. Totally agree). Exh. 5A at 6. In a later exchange, when the court initially asks Wu why he cares what Miss Zooey does, Wu responds with "What?", but then when the Court reiterates the

---

[4]The court reporter transcribed this word as "Court," but having listened to the audio recording, particularly when Wu then asks to "see the [quote] again" and notes that it was "kind of some language right on the poster you can put on the school," Exh. 5A at 6, it may be that he said "quote," not court.

question (THE COURT:  Why do you care if she goes back, or she posts or doesn't post?), Wu's answer indicates that he understands the question (WU:  Because what she posts kind of like damage the reputation of the international students from China and the old student from China). Exh. 5A at 7.  Given the sequence of this exchange, it is not clear that Wu's initial response indicates lack of understanding or processing a provocatively framed question.  Similarly, the exchange about where he was in school, the "What" does not appear to indicate lack of understanding since he immediately repeats the question (WU: Where I go to school?) to confirm that he heard or understand it correctly.  Exh. 5A at 10.  When the judge confirms the question, Wu answers appropriately Berklee College of Music.[5]  Lastly, when it appears that Wu does not understand the term "siblings," he asks the judge for clarification (WU: How many what?).  Exh. 5A at 13.  When the judge rephrases to ask how many brothers or sisters do you have, Wu answers appropriately (WU:  Oh, I'm the only one).  Exh. 5A at 13.  None of these exchanges indicate that Wu's comprehension was so poor as to render his statements involuntarily, particularly in the context of the entire proceeding.  Notably, the hearing began, apparently, with Wu reading an affidavit filed by Miss Zooey.  Exh. 5; Exh. 5A at 3.  Although such affidavit is not part of the record, it is reasonable to assume that it was filed by her in support of her application to the court for a TRO and summarized the alleged threats by Wu.  Wu comprehended this document sufficiently to respond that he "[t]otally disagree with that" and that her allegation were "not true." Exh. 5A at 3.  Moreover, in defending himself against Miss Zooey's allegations supporting her request for a TRO, Wu also was able to communicate that she had allegedly threatened to put his name on the poster and post it back in PRC and that put him at risk of harm, namely that he could

---

[5] The state court reporter lists his response as inaudible, but this Court clearly heard this response on the recording.  Exh. 5.

be arrested when he returned to the PRC.  Exh. 5A at 8.  In fact, this exchange caused the judge to question Mis Zooey about her alleged conduct against Wu.  Id.  Given all of these circumstances, the Court does not conclude that Wu's will was overborne or he was coerced or that his statements during this proceeding were otherwise involuntary.

**V.      Conclusion**

For all of the aforementioned reasons, Wu's motion to suppress his statements in Brighton District Court on November 18, 2022 and his statements to the FBI on December 14, 2022 and the evidence obtained as a result of such statements (including but not limited to the passcode to Wu's phone), D. 44, is DENIED.

**So Ordered.**

/s Denise J. Casper
United States District Judge