UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Docket No.  1:23-cr-10005-DJC |
| | ) | |
| XIAOLEI WU | ) | |
|      Defendant. | ) | |
| | ) | |

**DEFENDANT XIAOLEI WU'S SENTENCING MEMORANDUM**

Xiaolei Wu arrived in the United States in August 2021 as a young man having achieved his long-held dream – studying jazz at the world-renowned Berklee College of Music. It was a dream that was hard-earned.  His parents, both Government officials, initially had not been supportive of his passion for music, or of his hope, since childhood, to be a professional musician. *See* Trial Ex. 30, at 6. However, eventually through much work, and once he agreed to finish another college degree, he convinced his family to allow him to pursue his dream, and they rallied to support him. *See Letter from Wu's Mother*, attached as Exhibit A; *Letter from Guo Zhiyong*, attached as Exhibit B; *Letter from Pang Shu Hung*, attached as Exhibit C; *Letter from Hui Ping*, attached as Exhibit D.

Next, he had to go through the demanding admissions process at Berklee College of Music, testing, auditioning, and proving that he had what it takes intellectually and musically to succeed at one of the best music schools in the world. *See* Trial Ex. 30, at 5-7. While there, Mr. Wu demonstrated his passion for music, his respect for his professors and classmates, his "hunger for information related to all aspects of jazz guitar's form and function in an ensemble setting," and his commitment to improving at his craft. *See Letter from John Baboian*, attached as Exhibit E; *Letter from Ron Mahdi*, attached as Exhibit F; *Letter from Letao Zhang*, attached as

Exhibit G. He was well on his way to achieving his dream of graduating from Berklee College of Music and beginning a successful career as a jazz musician.

That dream has now come crashing down due to behavior over the course of approximately two days– behavior that Mr. Wu now acknowledges as reactive, impulsive, and immature; behavior that was reflective of cultures colliding – his own highly sheltered upbringing in Communist China, and the democratic norms of the United States, many of which were still relatively new to him at the time of the offense.[1] His behavior also took place against the unusual backdrop of COVID-19, an issue that was creating particularly charged fissures for Chinese citizens.

This backdrop was more than political for Mr. Wu – it was very personal, as *both* of his beloved grandfathers had died of the disease. Mr. Wu lost his first grandfather to COVID-19 in May 2020. His second grandfather died of COVID-19 on October 7, 2022, just two weeks before the conduct leading to this case. *See Letter from Wu's Mother*, attached as Exhibit A. This led to behavior that was anomalous for this young man who loves jazz music, cats, and cooking, and who worked hard in developing his passions, and earned the respect of others for doing so. *See No Criminal History Certificate*, attached as Exhibit H; *Letter from Wu's Mother*, attached as Exhibit A; *Letter from Pang Shu Hung*, attached as Exhibit C; *Letter from John Baboian*,

---

[1] The Government suggests that Mr. Wu's conduct resulted in Miss Zoey's father being "subjected to repeated visits in China by representatives of the PRC government – a result which the defendant anticipated." *See Gov't Mem.*, at 1. The Government goes on at length at pages 5-6 of its 9-page sentencing memorandum about alleged specific incidents that occurred in China between members of the Chinese government and Miss Zoey's father. The entirety of these bare assertions are framed as being "[a]ccording to Miss Zoey." *See Gov't Mem.*, at 5. However, Miss Zoey appears to have no personal knowledge of these alleged incidents. The only evidence Miss Zoey's father was subjected to such visits is unreliable third-level hearsay which should be disregarded (Miss Zoey's father purportedly told Miss Zoey about certain incidents that occurred in China, which Miss Zoey then relayed to FBI agents; an unidentified individual in China purportedly told an unidentified friend of Miss Zoey's in the U.S. about other incidents, who then relayed these statements to Miss Zoey and FBI agents). Notably, the Government did not even seek to introduce evidence of any of this at trial. Moreover, there is *no* evidence that Mr. Wu anticipated that, from having a conversation with his own mother about a conflict he was having at school, that Miss Zoey's father in China would be visited by representatives of the Chinese government. Without further evidentiary development of these issues, the Court should disregard the entirety of these unreliable assertions.

attached as Exhibit E; *Letter from Ron Mahdi*, attached as Exhibit F; *Letter from Letao Zhang*, attached as Exhibit G.

In addition, the words for which Mr. Wu was charged and convicted were expressed in the very different and often callous universe of youthful text and internet mediated exchange. He now knows that these words had an impact well beyond his imagination and were received as offensive, troubling, threatening and harmful. At the time he uttered them – and against this complex backdrop of COVID-19 and the recent loss of his grandfather – he did not appreciate the harm he could and did cause. However, after the two-day back and forth between Ms. Zoey and Mr. Wu, and when they were both asked by Berklee College to stop their exchange, he did precisely that, and never spoke to her again. None of this is to diminish the wrongfulness of Mr. Wu's conduct in this case. But it does provide meaningful context. He was reckless and callous, and he has been punished deeply for it already.

For his words over the course of less than two days, he was held on pretrial home confinement for a year. After this case is over, he will be taken into custody by Immigration and Customs Enforcement and deported. He will never be permitted to re-enter the United States. He likely will be unable ever to travel to numerous other countries, such as Canada, the United Kingdom, and Japan.[2] And for him, devastatingly, after putting his heart and soul into studying and rehearsing for several semesters, he will not be able to return to and complete his degree at Berklee College of Music. He has lost the hope of ever continuing to pursue his dream of learning American jazz and touring the world.

---

[2] *Countries You Can't Visit If You Have a Felony Conviction*, Carlson, Meissner & Hayslett, https://carlsonmeissner.com/blog/countries-you-can-t-visit-if-you-have-a-felony-conviction/ (last visited Apr. 14, 2024); *Countries You Can't Travel to With a Criminal Record*, VisaGuide, https://visaguide.world/tips/countries-you-cant-travel-to-with-a-criminal-record/ (last visited Apr. 14, 2024).

He is also a previously sheltered young man, living in a dramatically different culture for the first time, who behaved badly and communicated recklessly for approximately two days, and who, when asked to course correct and cease this behavior, did so, immediately (and did so long before any prosecution or other court action commenced). For these reasons, after consideration of the advisory United States Sentencing Guidelines and the applicable factors contained in 18 U.S.C. § 3553(a) and the goals set forth therein, Mr. Wu requests that this Court impose a sentence of **time served,** with self-deportation immediately to follow. If deemed appropriate and meaningful in this context, the court could also assess a fine.[3] This sentence is appropriately harsh given the time he already served in home-confinement and the collateral consequences that are a direct result of his being charged and convicted in this case.

## ARGUMENT

The requested recommendation considers, without wholly adopting, the framework provided by the United States Sentencing Guidelines and is sufficient to promote respect for the law and serve the purposes of punishment, rehabilitation and deterrence, pursuant to 18 U.S.C. § 3553, while recognizing the unique circumstances of this case.

I.   **The right to trial is a bedrock principle of the criminal justice system. Imposing a lengthier sentence – or "trial tax" – because Mr. Wu did not plead guilty would unfairly penalize Mr. Wu for exercising his rights, and perpetuate the disturbing trend of discouraging trial in favor of pleas at any cost.**

Prior to trial, the Government was willing to resolve the case without imposing any prison time, representing a significant downward variance from the Guidelines. The Government now requests a sentence at the low-end, without providing any justification for why it is no longer seeking a variance. Adopting the Government's request as a reasonable starting point would, in essence, punish Mr. Wu for electing to go to trial.

---

[3] Under U.S.S.G. § 5E1.2(c)(3), with a total offense level of 20, the Guidelines fine range is from $15,000 to $150,000.

Even if the outcome of Mr. Wu's case seemed a foregone conclusion from the outset, even if pleading guilty might have been quicker, less contentious, and less expensive, Mr. Wu's decision to hold the Government to its burden should not be weighed against him in fashioning his sentence. While an individual certainly "may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right." *United States v. Goodwin*, 457 U.S. 368, 372 (1982). Punishing a person because he has "done what the law plainly allows him to do is a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). Using the Government's request as a reasonable starting point for crafting a sentence would amount to a "trial tax."

A trial tax, or "trial penalty" occurs where a judge "impos[es] a more severe sentence on a defendant, in whole or in part, because the accused, who elected to reject the prosecution's plea agreement and go to trial, wasted judicial and prosecutorial resources involved in a trial." J. Vincent Aprile II, *Judicial Imposition of the Trial Tax*, 29 Crim. Just., Spring 2014, at 30. Many scholars argue that trial penalties in America have become so severe that defendants have no real choice but to accept whatever sentence the prosecutor chooses to offer for pleading guilty. *See*, *e.g.*, Nat'l Ass'n of Crim. Def. Laws, The Trial Penalty: The Sixth Amendment Right to Trial on the Verge of Extinction and How to Save It 5 (2018)[4] [hereinafter NACDL Report] ("individuals who choose to exercise their Sixth Amendment right to trial face exponentially higher sentences" than those who plead guilty); Máximo Langer, *Rethinking Plea Bargaining: The Practice and Reform of Prosecutorial Adjudication in American Criminal Procedure*, 33 Am. J. Crim. L. 223, at 225, 248-56 (2006) (arguing that "prosecutors have become some of the main de facto adjudicators of U.S. criminal procedure"); Gerard E. Lynch, *Our Administrative System of Criminal Justice*, 66 Fordham L. Rev. 2117 (1998) (arguing that our criminal justice system

---

[4] Available at https://www.nacdl.org/Document/TrialPenaltySixthAmendmentRighttoTrialNearExtinct.

more closely resembles administrative justice presided over by the prosecutor than an adversarial justice system); Jeffrey Standen, *Plea Bargaining in the Shadow of the Guidelines*, 81 Calif. L. Rev. 1471, 1513 (1993) (arguing that charge bargaining under the guidelines makes the prosecutor "no longer the price taker but the price setter").

The "trial penalty" is severe. According to one study, "Overall, controlling for all other factors, the sentence following a jury trial conviction is 44.5 months more severe than the sentence imposed after a guilty plea." Candace McCoy, *Plea Bargaining as Coercion: The Trial Penalty and Plea Bargaining Reform*, 50 Crim. L.Q. 67 (2005). Another study analyzing the "trial tax" in Federal courts noted that "a significant 15% sentence length difference still remains after accounting for Guideline-approved factors that are connected to pleading guilty, and after controlling for upward departures and downward departures that are not related to substantial assistance to law enforcement." Ulmer, Jeffery Todd et al., *Trial Penalties in Federal Sentencing: Extra-Guidelines Factors and District Variation*, Justice Quarterly, Vol. 27, No. 4, 2010, at 16. More recent research on the federal trial penalty– again, accounting for the effect of acceptance of responsibility, and excluding the effects of charge or fact bargaining – calculated that "federal defendants convicted at trial receive sentences that are sixty-four percent longer than similar defendants who plead guilty." Andrew Chongseh Kim, *Underestimating the Trial Penalty: An Empirical Analysis of the Federal Trial Penalty and Critique of the Abrams Study*, 84 Miss. L.J. 1195, 1201-02 (2015). Given such findings, the author reasoned, it is little wonder that fewer and fewer defendants are pursuing their trial rights, and that defense attorneys are inclined to counsel plea bargaining:

> [T]he Sixth Amendment right to trial by a jury of one's peers is protected and sacrosanct. This study, however, demonstrates that the criminal justice system is structured in such a way that extremely few rational defendants would ever stand up and exercise that right. In such a system, trial by jury becomes less of a right, and more of a trap for fools.

*Id.* at 1250.

If the point of the criminal justice system was to shunt defendants from arraignment to sentencing as efficiently as possible, then the trial tax makes perfect sense. Assuming, however, that the object is to discover the truth of the allegations against the defendant, then the trial tax is counterproductive, tilts the playing field in favor of the Government, and discourages defendants from pursing their Sixth Amendment rights.

In that last respect, it is undeniably working. According to the most recent Sentencing Commission statistics, only 2.8 percent of defendants in federal cases nationally went to trial in 2023 with 5.9 percent doing so in this District. *United States Sentencing Commission 2023 Sourcebook of Federal Sentencing Statistics*, Table 11 "Guilty Pleas and Trials in Each Circuit and District: Fiscal Year 2023."[5] More broadly, the trial rate has collapsed in recent years in the federal courts. "[W]hereas in 1980, 19 percent of all federal defendants went to trial, by 2000 the number had decreased to less than 6 percent and by 2010 to less than 3 percent, where it has remained ever since." Hon. Jed S. Rakoff, *Why Innocent People Plead Guilty*, N.Y. Rev. of Books, November 20, 2014. The numbers imply that the right to trial is endangered nationally, with this District among the few climbing modestly above 5 percent in recent years.[6]

The decline in trials is linked, in part, to the acceptance of responsibility reduction, which operates as a 3-point tax on the exercise of a constitutional right.[7] See, Michael M. O'Hear,

---

[5] Available online at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2023/Table11.pdf.

[6] Reviewing USSC sentencing statistics between 2010 and 2016, the average rate of cases going to trial in this district was 7.1 percent, with a high of 8.9 percent in 2012, and a low of 4.8 in 2016. *See, generally*, https://www.ussc.gov/research/sourcebook/archive.

[7] The Guidelines recognize that the acceptance of responsibility discount may be appropriate after trial, noting that "[c]onviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction." §3E1.1 (App. Note 2). Any other position would effectively concede the discount is a de facto trial penalty. However, the mere fact of the acceptance discount's post-trial availability is less telling than the frequency of its application. One study showed that, nationally, "3% of trial defendants received the two-point acceptance of responsibility reduction and 2% of them received the full three-point reduction." Jeffery T. Ulmer, James Eisenstein

*Remorse, Cooperation, and "Acceptance of Responsibility": The Structure, Implementation, and Reform of Section 3E1.1 of the Federal Sentencing Guidelines*, 91 NW. U. L. REV. 1507, 1534 (1997) (concluding that acceptance of responsibility is "a more-or-less automatic plea discount"). However, "the trial penalty cannot be attributed to any single cause. Rather, many shortcomings across the criminal justice system combine to perpetuate this injustice." NACDL Report, at 7. The "unbridled discretion" of prosecutors, the fact that the "formulaic calculations" under the federal Sentencing Guidelines "often result in sentences far out of proportion with a defendant's actual culpability," and judges' hesitance to exercise their discretion to sentence outside the Guidelines, combine to result in "excruciating penalties" for those "rare defendant[s who] insist[] on [their] right to a trial[.]." *Id.* "Those penalties then serve as a warning to the next defendant who will know his only hope of obtaining a fair sentence is to forego the right to a trial." *Id*.

Proportionality between pre-trial and post-trial sentencing "ensures that the accused are not punished with substantially longer sentences for exercising their right to trial, or its related rights. *Id*. at 13. It thus meaningfully protects the right of criminal defendants to exercise their right to a trial and curbs the ability of prosecutors to exercise their discretion in a coercive manner to obtain guilty pleas. "Concretely, post-trial sentences should not increase by more than the following: denial of acceptance of responsibility (if appropriate); obstruction of justice (if proved); and the development of facts unknown before trial."[8] *Id*.

Here, the 33-month sentence sought by the Government amounts to a punishment for going to trial, where the Government previously offered – and was therefore willing to accept – a sentence involving *no incarceration* if Mr. Wu agreed to plead guilty to the same charges of which he was convicted after trial. "While most prosecutors will not acknowledge that

---

and Brian D. Johnson, *Trial Penalties in Federal Sentencing: Extra-Guidelines Factors and District Variation*, Justice Quarterly, 2009.

[8] In this case, the only applicable increase is denial of acceptance of responsibility.

defendants should be punished for going to trial, most adopt the attitude that leniency is only for those defendants who admit their guilt before trial which, of course, amounts to [the] same thing." NACDL Report, at 30. This is precisely the attitude adopted by the Government in this case. The court should not be swayed by this approach which runs counter to the basic constitutional right of trial by jury.

As Thomas Jefferson said, "I consider [trial by jury] as the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution." Trials serve as a check on prosecutorial power, assure active judicial oversight of criminal proceedings, and guarantee the full exercise of due process for federal defendants. These benefits disappear if the exercise of the trial right comes burdened with harsher penalties. It is no answer to this to say that a guilty plea reflects contrition when most defendants plead, not due to contrition, but because "[sentencing] guidelines … provide prosecutors with weapons to bludgeon defendants into effectively coerced plea bargains." Hon. Jed S. Rakoff, *Why Innocent People Plead Guilty*, N.Y. Rev. of Books, November 20, 2014. If the courts become mere plea-mills with justice being done only at the whim and will of an obliging government and then only when its ends are served, the claim of justice under law will be empty words.

Reforming this aspect of the Federal criminal justice system must come primarily from judges. Although the problem derives in part from the Sentencing Guidelines and the Government's ability to make coercive plea offers, it is ultimately the judge who imposes the trial tax at sentencing. Nothing compels this Court to collect the tax on defendants who lose at trial. Indeed exercising the trial right is not a waste of time or resources, it is what is *supposed* to be happening – at least much more frequently than it is currently –in a constitutional democracy.

In this case, the non-application of U.S.S.G. § 3E1.1 (acceptance of responsibility) adds an additional 9-11 months to the Governments pre-trial offer of a non-carceral sentence.[9] Therefore, absent a desire to punish Mr. Wu for going to trial, this number would reflect a Government sentencing request that acknowledges the framework provided by the Guidelines. The Government should not, as it has done by seeking a carceral sentence well above this number, be urging the Court to collect a trial tax from Mr. Wu. To the extent that it is doing so, this Court should not allow this urging to color its evaluation of what is an appropriate sentence.

II. **The Guideline range in this case dramatically overstates what would be a just sentence in this case.**

The requested sentence is the one that best achieves the goals of sentencing. Mr. Wu agrees with the technical calculation of the guidelines as calculated by United States Probation 33 to 41 months.[10] While the court must of course consider the framework provided by the guidelines, in this particular case, they provide very limited insight into how best to advance the purposes of punishment.

III. **The Requested Sentence Meaningfully Considers the 18 U.S.C. § 3553 Factors, And Best Furthers the Statutory Purposes of Punishment.**

Recognizing the immense discretion afforded to sentencing judges, sentencing courts should "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *United States v. Olbres*, 99 F.3d 28, 37 (1st Cir. 1996) (quotation and citation omitted).

---

[9] Mr. Wu has no prior criminal history such that his criminal history category is I. The total offense level (TOL) with acceptance of responsibility is 17, with a corresponding Guidelines sentence of 24 to 30 months. Without acceptance of responsibility, the TOL is 20, with a corresponding Guidelines sentence of 33 to 41 months. The difference in the two sentences is 9 to 11 months. Thus, an appropriate post-trial request representing denial of acceptance of responsibility is 9 to 11 months, rather than the 33 months requested by the Government here.

[10] Mr. Wu acknowledges that the two-point enhancement for "a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim" technically applies. U.S.S.G. § 2A6.2(b)(1)(E). However, its application does not reflect the limited nature of Mr. Wu's conduct, which took place over little more than 24 hours, and which he ceased immediately when told to do so by campus personnel.

The First Circuit has stressed that sentencing determinations require a "more holistic inquiry" than simply plugging numbers into a Guidelines calculation, and that, at least in the federal context, the statutory factors to be considered are "a tapestry [], through which runs the thread of an overarching principle [of parsimony]." *See United States v. Yonathan Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008), citing *Kimbrough v. United States*, 562 U.S. 85, 101 (2007). That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id*.

In so doing, the Court must first consider the nature and circumstances of the offense in the context of the history and characteristics of the offender. 18 U.S.C § 3553(a)(1). The Court must then consider the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Put simply, these four purposes of sentencing are punishment, deterrence, incapacitation, and rehabilitation. Finally, the Court should consider the "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

The Court must fashion a sentence that considers the nature and circumstances of the offense in the context of Mr. Wu's particular background. 18 U.S.C. § 3553(a)(1). The requested sentence balances these factors; it recognizes that the direct consequences of Mr. Wu's conviction have been – and will remain – devastating for the rest of his life.

### A. Mr. Wu's early years

Mr. Wu is the only child of two civil servants and grew up with the pressures of their hopes for him. *See Letter from Wu's Mother*, attached as Exhibit A; *Letter from Letao Zhang*,

attached as Exhibit G. Mr. Wu's parents were often busy with work, and he would often spend time with his cousin and uncle, who taught him to love cooking. *See Letter from Letao Zhang*, attached as Exhibit G. He had a kind heart from a young age, and was drawn to caring for animals, specifically cats. *See Letter from Wu's Mother*, attached as Exhibit A; *Letter from Pang Shu Hung*, attached as Exhibit C. He even once rescued a stray cat, nursing him back to health, and eventually giving the cat to his aunt when he saw that she was lonely and could benefit from the cat's companionship. *See Letter from Wu's Mother*, attached as Exhibit A. Meanwhile, Mr. Wu's parents pushed him into a variety of extracurriculars: swimming, Mathematical Olympiad, vocal music, painting, and skiing. *See Letter from Wu's Mother*, attached as Exhibit A.

Once Mr. Wu began learning guitar in junior high school, he "has been obsessed with it ever since." *See Letter from Wu's Mother*, attached as Exhibit A. However, his parents wanted him to take a more traditional path, and required that he go to a conventional university, first to study engineering and then English. *See Letter from Wu's Mother*, attached as Exhibit A. He dutifully did so, all the while devoting every free moment to practicing guitar so he could one day attend "the world's best Berklee College of Music." *Id*. Not even a badly broken wrist could prevent him from practicing. *Id*. Mr. Wu's commitment ultimately led his family to understand his dreams of being a musician, and they later supported his goals of studying at Berklee. *Id.* His grandfather, who died of COVID-19 on October 7, 2022, had even gone so far as to sell his property to enable Mr. Wu to come to the United States to study jazz. *Id.*

### B. Mr. Wu's time in the United States

Mr. Wu came to the United States in August 2021 with a heart and head full of hopes and aspirations. He had finally achieved his dream of attending Berklee College of Music. However, while he was intellectually and musically prepared for what would come, he was unprepared for the shock of living in a very different culture, and emotionally immature after having lived a

very sheltered life. Despite these challenges, and despite at times feeling very isolated, he threw himself into music, impressing his professors with his commitment and skill. Mr. Wu's guitar teacher noted that Mr. Wu was "a very good student with a passion for music and wanting to progress as a creative musician." *Letter from John Baboian*, attached as Exhibit E. He found Mr. Wu pleasant and respectful of staff and classmates, and based on Mr. Wu's "musical abilities, . . . character and ability to get along with the other students in the ensemble," he invited Mr. Wu to join his "audition only" advanced guitar ensemble. *Id*. Mr. Wu's bass teacher found Mr. Wu to be "[v]ery eager to hear [his] perspective, always respectful to [him] and his classmates." *See Letter from Ron Mahdi*, attached as Exhibit F. He was impressed with Mr. Wu's progress and commitment to this new-to-him instrument. *Id.*

While half a world away, Mr. Wu remained in close contact with his mother, calling nearly every day. *See Letter from Wu's Mother,* attached as Exhibit A; *Letter from Pang Shu Hung*, attached as Exhibit C. While his parents were government officials, he was never a political person – always seeing himself as an artist. However, the COVID-19 pandemic was deeply personal to him – he lost both of his beloved grandfathers to the disease – his first grandfather contracted and passed away from COVID-19 during a hospital stay in May 2020, and his second grandfather passed away from COVID-19 on October 7, 2022 (just two weeks prior to the offense conduct in this case). *See Letter from Wu's Mother*, attached as Exhibit A.

Around this same time, protests erupted in China over the country's strict COVID policy. *See* H. Davidson*, 'We All Saw It': Anti-Xi Jinping Protest Electrifies Chinese Internet*, Guardian (Oct. 14, 2022)[11]; L. Yuan, *A Lonely Protest in Beijing Inspires Young Chinese to Find Their Voice*, N.Y. Times (Oct. 24, 2022)[12]; J. Yeung*, China's Lockdown Protests: What You Need to*

---

[11] Available at https://www.theguardian.com/world/2022/oct/14/we-all-saw-it-anti-xi-jinping-protest-electrifies-chinese-internet.
[12] Available at https://www.nytimes.com/2022/10/24/business/xi-jinping-protests.html.

*Know*, CNN (Nov. 29, 2022).[13] With the loss of his grandfather so fresh, Mr. Wu was both aware of, and upset by, these protests. His grief, his separation from the family he loved and culture in which he grew up, his stress of being in a new and unfamiliar environment, and his immaturity, all converged and resulted in his dysregulated and inappropriate response to seeing COVID protest materials on his campus in Boston. However, when made aware of the wrongfulness of his behavior and asked to stop by school personnel, he did so immediately.

Mr. Wu's early and complete cessation of the conduct which gave rise to this case is consistent with his trajectory during his highly restrictive pre-trial confinement. Mr. Wu, a young man in his early twenties, initially was required to surrender his passport, abide by a curfew between 9:00 p.m. and 8:00 a.m., submit to GPS monitoring, and stay away from Berklee College of Music campus and any affiliated activities off campus. *See* ECF no. 13. The result: Mr. Wu was suddenly completely isolated from the only limited community he had in Boston. This has had a profound impact on Mr. Wu's mental health. *See Letter from Wu's Mother*, attached as Exhibit A. His mother noticed that he was no longer able to concentrate on their conversations, he lost his usual enthusiasm for the things he loved, and he became depressed. *See Letter from Wu's Mother*, attached as Exhibit A.

Despite this, Mr. Wu's conduct under supervision was nothing short of perfect. Based in part on his exemplary record of compliance, Mr. Wu's conditions of release were modified on April 24, 2023. Mr. Wu was no longer required to submit to GPS monitoring, and his curfew was removed. *See* ECF no. 24. Mr. Wu's compliance with his conditions of release continued, and he arrived early for every court appearance. More recently, considering the toll the case and trial took upon him, as well as a desire to understand the factors that led him to engage in the offense

---

[13] Available at https://www.cnn.com/2022/11/28/china/china-lockdown-protests-covid-explainer-intl-hnk/index.html.

conduct, Mr. Wu started mental health treatment. *See Letter from Douglas Baker*, attached as Exhibit I. His treating therapist observed that Mr. Wu "is a thoughtful, generally stable, intelligent[,] and apparently kind young man – who unfortunately got carried away with anger in the messages he sent." *Id.* Since then, however, Mr. Wu "has demonstrated good insight about his case, including owning the responsibility that he should have known better than to send the messages." *Id.* Mr. Wu's commitment to self-reflection about the root causes of his behavior, combined with his commitment to self-growth, indicate that the offense conduct will remain as it was – an anomalous episode in an otherwise law-abiding and productive life.

## IV.   The Requested Sentence Advances the Objectives Embodied Within 18 U.S.C. § 3553(A)(2).

The 18 U.S.C. § 3553(a)(2) factors seek to advance the four goals that are typically attributed to sentencing: retribution, rehabilitation, deterrence, and incapacitation. *See United States v. Tapia*, 564 U.S. 319 (2011) ("In determining the appropriate sentence, judges must consider retribution, deterrence, incapacitation, and rehabilitation, § 3553(a)(2), but a particular purpose may apply differently, or not at all, depending on the kind of sentence under consideration.)

Retribution refers to just desserts. What is just and the usefulness of the "desserts" is unclear. While retribution may have its place, it should not be elevated above other considerations, and to the detriment of the other three objectives. "Retribution sits uncomfortably at the intersection of two aspects of our responses to harm: our desire for people to suffer and our desire for people to change [….] But there is another option [….] the issue is not just how we show our condemnation, but how we affirm unequivocally and powerfully the importance of what was violated, without destroying the person who violated it."[14]

---

[14] Sered, Danielle, *Until We Reckon, Violence, Mass Incarceration and a Road to Repair* 89-90 (2019).

The laws that Mr. Wu violated are important and exist for a reason and serve to protect individuals from harassment and harm. Yet it is equally important to recognize that Mr. Wu – acting impulsively in the context of a back-and-forth digital exchange surrounding China's COVID-19 policies while grieving the very recent loss of his grandfather from that same disease did not fully appreciate the impact of his words at the time that he uttered them. He is not a criminally oriented person seeking to harm; he is an emotionally immature young man with no previous criminal record, a caring son, an animal lover, and a talented musician who will now need to recreate a life very different than the one he imagined and had been working towards for years. A just sentence will punish his criminal conduct, but should also seek to preserve, rather than squander those good traits.

In this context, the requested sentence would promote respect for the law pursuant to § 3553(a)(2)(A) because "the unique facts of Mr. [Wu's] situation" support the conclusion that, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. United States*, 552 U.S. 38, 54 (2007) (citations omitted). In addition, the requested sentence acknowledges that were it not for the inevitable fact of deportation, the Court could impose a non-custodial sentence of home-confinement. Here, while that may not be an option – that punishment has nevertheless been achieved through highly restrictive pre-trial confinement.

 To determine what is "just punishment" for Mr. Wu under 18 U.S.C. § 3553(a), the Court must consider how Mr. Wu will serve any possible prison time and the certainty of his deportation following incarceration. The First Circuit has held that "a sentencing court has the discretion, in an appropriate case, to weigh the possibility of future deportation when mulling the section 3553(a) factors in an effort to fashion a condign sentence." *United States v. Hercules*,

947 F.3d 3, 9 (1st Cir. 2020). A defendant's potential deportation is thus relevant to several §
3553(a) factors. *Id.* First, "a defendant's potential deportation may properly be considered as part
of a broader assessment of his history and characteristics pursuant to section 3553(a)(1)." *Id.*
Second, "a defendant's potential deportation . . . may prove relevant to whether a sentence will
adequately 'protect the public from further crimes of the defendant.'" *Id.*, quoting 18 U.S.C. §
3553(a)(2)(C). Third, "[f]uture threats to the community might conceivably be mitigated in a
situation in which, upon release from imprisonment, the defendant will promptly be deported."
*Hercules*, 947 F.3d at 9 (citing *United States v. Morales-Uribe*, 470 F.3d 1282, 1287 (8th Cir.
2006)).

As a result of Mr. Wu's immigration status, which the BOP treats as a public safety
factor, if he is held in custody he will face harsher and more restrictive terms of incarceration
than others convicted of similar offense conduct.[15] Following completion of his term of
incarceration in the BOP, he will be further detained in an ICE facility, where he will remain
until he is ultimately deported.[16] Further, any risk to citizens and other residents of the United

---

[15] U.S. Bureau of Prisons Program Statement 5100.08, *Inmate Security Designation and Custody Classification*, ch.
5, at 9 (Sept. 4, 2019), available at https://www.bop.gov/policy/progstat/5100_008cn.pdf. This results in harsher and
more restrictive terms of incarceration. *See* National Immigration Project, *Public Comment on Proposed
Amendments re: Immigration Consequences, Cultural Assimilation, and Recency (75 Fed. Reg. 3525, Jan. 21,
2010)*, at 2-3 (Mar. 22, 2010), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-
comment/20100317/National%20immigrationProject.pdf [hereafter "NIP Public Comment"]. "The physical reality
of a higher security facility has serious detrimental e[e]ffects on a prisoner's mental health[.]" *Id.* at 3. The National
Immigration Project noted that these detrimental effects include, but are not limited to, an inability to obtain outside
work assignments, restrictions on access to mail, limited ability to have contact visits with family members, and
limited or no access to occupational and educational programs. *Id.* at 2-3.

[16] On completion of any sentence imposed, Mr. Wu would be immediately transferred into ICE custody, pending his
inevitable deportation. *See Bado v. United States*, 186 A.3d 1243, 1254 & n.22 (D.C. Cir. 2018) (individual who is
not legal permanent resident convicted of aggravated felony subject to mandatory detention pending removal
proceedings and during period between time order of removal is entered and when individual is actually removed)
(*citing* 8 U.S.C. § 1231(a)(2)). Furthermore, ICE may detain Mr. Wu for six months or more. *See Reid v. Donelan*,
17 F.4th 1, 4 (1st Cir. 2021) (no per se constitutional entitlement to bond hearing after six months of ICE detention
while awaiting deportation). *See also Alphonse v. Moniz*, No. 21-11844-FDS, 2022 WL 10480100, slip op. at 4-5
(D. Mass. Oct. 17, 2022) (detention under § 1226(c) for more than one year likely to be unreasonable; likely
violation of due process rights where individual was detained pending deportation without bond hearing for nearly
twenty-two months).

States (if there is one) will be eliminated[17] when he is deported, making concerns regarding specific deterrence and incapacitation less relevant.

In further considering the issue of specific deterrence, Mr. Wu does not pose a cognizable risk of danger to the community or of recidivism. Upon completing his sentence, he will return to China where he has a home and family to return to. It is not unreasonable to suggest that Mr. Wu's arrest, year of restrictive conditions amounting nearly to home-confinement, and the loss of every single one of his educational and professional dreams, provide adequate specific deterrence from future offending. As a first-time offender with no prior exposure to the criminal justice system or to being incarcerated, Mr. Wu has paid a substantial price for a non-violent, non-drug offense.

Finally, there is also no rehabilitative value for a sentence any longer than that proposed. Indeed, Congress itself has "recognize[ed] that imprisonment is not an appropriate means of promoting correction and rehabilitation." *See* 18 U.S.C. § 3582(a). Mr. Wu has no mental illness or substance use disorder history that requires intervention or treatment, and as a "deportable alien," he will not be eligible for placement in a residential re-entry center. *See* BOP Program Statement 7310.04 at 10. Finally, Mr. Wu does not need a longer sentence to promote rehabilitation or specific deterrence; he has demonstrated, through his conduct that he assumed responsibility for his own rehabilitation both through his perfect pre-trial confinement record as well as his engagement with therapy and volunteer work.

---

[17] Due to his country of origin alone, the risk of illegal re-entry is quite low and, given Mr. Wu's background, is zero.

## CONCLUSION

For the above reasons, Mr. Wu respectfully requests that the Court sentence him to time served, with self-deportation immediately to follow. This sentence is sufficient, but not greater than necessary, to accomplish the purposes of sentencing under 18 U.S.C. § 3553(a).

Respectfully Submitted,
**Xiaolei Wu**
By his attorneys,

/s/ Michael Tumposky
Michael Tumposky (BBO #660618)
Hannah L. Taylor (BBO #710056)
Hedges & Tumposky, LLP
88 Broad St., Suite 101
Boston, MA 02110
617-722-8220

## CERTIFICATE OF SERVICE

I, Michael Tumposky, hereby certify that on this 17th day of April, 2024, I served one true and correct copy of this memorandum via electronic filing to all counsel of record in this matter.

/s/ Michael Tumposky
Michael Tumposky